**Dale C. DAVIS, Plaintiff–Appellee,**

**v.**

**METRO PRODUCTIONS, INC.; Ralph Smith, Defendants,**

**and**

**Michael L. Miller, Defendant–Appellant.**

**Dale C. DAVIS, Plaintiff–Appellee,**

**v.**

**METRO PRODUCTIONS, INC.; Michael L. Miller, Defendants,**

**and**

**Ralph Smith, Defendant–Appellant.**

**Nos. 87–2739, 87–2741.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 14, 1988.

Decided Aug. 31, 1989.

Michael Miller, Torrance, Cal., pro. per.

William L. Thorpe, Fennemore Craig, Phoenix, Ariz., for defendant-appellant Ralph Smith.

J. Clayton Berger, Teilborg, Sanders & Parks, Phoenix, Ariz., for plaintiff-appellee.

Before GOODWIN, Chief Judge, SNEED, Senior Circuit Judge, and HUG, Circuit Judge.

GOODWIN, Chief Judge:

A disappointed purchaser of a tax shelter later held by the Internal Revenue Service to be defective sued for treble damages under the Arizona Racketeering Act, alleging fraud and unlawful securities transactions. The plaintiff, Dale C. Davis, had purchased the tax shelter from Metro Productions, Inc. ("Metro"), a California corporation. He sued Metro, but also sued Ralph Smith and Michael L. Miller, the sole stockholders of Metro, personally for their activities in the transaction. The trial court asserted long-arm jurisdiction over the corporation and the individual defendants, and, applying Arizona law, entered judgment against them. Defendant Metro does not appeal, but defendants Smith and Miller appeal, contending that the exercise of jurisdiction over them as individuals violated due process. We affirm.

## I. FACTS

### A. *Metro Productions, Inc.*

Appellants Smith and Miller were at all times the sole shareholders and officers of Metro, a California corporation incorporated in 1977. Neither appellant was nor is a resident of Arizona, nor has a place of business within Arizona.

From 1977 to 1978, Metro produced nearly 1,000 thirty-minute television episodes in several series. The series covered topics such as sewing, cooking, diet and health, religious singing, and game shows, and were said to be intended for distribution to

cable companies and the like. Each half-hour show was sold as a tax shelter through Producer's Liaison Corporation ("Producer's"), Metro's wholly owned subsidiary and marketing arm, or by outside commissioned salesmen, to investors throughout the United States.

The shows were produced as videotapes. Metro edited each master videotape purchased by an investor and copyrighted it in the investor's name. The master videotape was placed in storage in the investor's name, and each investor paid an annual rental fee through the videotape distributor chosen by the investor to manage his show or shows.

### B. *Information Memorandum*

Metro and its marketing agents used an information memorandum prepared by Metro in their solicitations of master videotape sales. The information memorandum contained background material regarding Metro and its producers, clippings showing the possible markets for videotapes, and schedules summarizing the tax savings opportunities alleged to be available from depreciation and investment tax credit, even if no income were to be realized from the investment. The package also contained a tax opinion letter written by Metro's law firm. In the memorandum, Metro identified Investor's Management Services, Inc. ("Investor's") as "a Management Services Group specializing in handling the placement and exploitation of video tape masters, which is accessible by telephone."

### C. *Production Service Agreement*

These so-called shows were sold pursuant to a contract entitled "Production Service Agreement" for a purchase price of $90,000,[1] with a $7,000 down payment, and a promissory note for $83,000. The note called for 7% annual interest with full recourse against the purchaser. A minimum annual payment of $2,000, to be applied against interest only, was to be made for five years. At the end of that period, the investor could extend the five-year period,

or, for a payment of an additional $1,000, convert the note to nonrecourse.

Other than the minimum annual payment, the only other mandatory payments of principal and the accrued, but unpaid, interest, were to be made out of the revenues derived from marketing the individual television segments by the investor.

In the Production Service Agreement, the buyer was informed that "it will be necessary for you to take the initiative to engage a Management Services Group, which will act as your Agent to obtain a Distributor to market your television video tapes." The buyer was reminded that he "must engage in efforts to produce income from the programs ... to utilize certain possible tax incentives."

### D. *Davis's Involvement*

During 1979, Dale C. Davis, D.D.S., an Arizona resident, introduced his accountant, James Allen, to Duane McCleary, who sold Metro's Production Service Agreements on a commission basis. McCleary was not licensed as a securities salesman. Allen was invited to accompany McCleary and to travel from Arizona, where he was a resident, to Los Angeles, for the purpose of meeting with Smith and Miller, the principals of Metro. During the meeting, Allen was advised that Investor's was available to market the videotapes on behalf of purchasers of Production Service Agreements, and that McCleary would pay Allen a fee for each client of Allen's who purchased a Production Service Agreement.

Shortly thereafter, Davis purchased from Metro, through Allen in Arizona, one episode of the "Sam Diego Show." He entered into the Production Services Agreement and engaged Investor's as his management agent. Thereafter, the Internal Revenue Service determined that the investment was an abusive tax shelter and disallowed the tax benefits.

## II. PRIOR PROCEEDINGS

Davis first brought suit in Arizona Superior Court under the Arizona Racketeering

---

**1.** The prices given in this paragraph are the prices charged in 1977. The 1978 prices were somewhat higher, but the exact figures are not relevant to this appeal.

Act, Ariz.Rev.Stat.Ann. [hereinafter ARS] § 13–2301 *et seq.* (Supp.1988), against defendants Smith and Miller, appellants here, Metro, and Producer's. He contended that defendants' sale to him, as a tax shelter, of a master videotape constituted an investment contract and therefore a security. Because the alleged security concededly was not registered and was sold by unlicensed salesmen, he alleged defendants had committed a securities violation, a predicate act under the Arizona Racketeering Act. *Id.* § 13–2301(D)(4)(s). Davis also alleged that the defendants had committed securities fraud, which is another predicate act. *Id.* § 13–2301(D)(4)(s). Alternatively, Davis alleged that if the tax shelter investment was not a security, then the Metro program constituted a scheme or artifice to defraud under A.R.S. § 13–2301(D)(4)(t). The suit was brought against the backdrop of three cases heard in the Arizona court system, involving the same scheme, and against the same defendants.[2]

Defendants removed the suit to United States District Court for the District of Arizona on the basis of diversity of citizenship. They made a Rule 12(b)(2), Fed.R. Civ.P., motion to dismiss based on lack of *in personam* jurisdiction. The denial of that motion presents the principal issue on appeal.

While the case was pending in the district court, the Arizona Court of Appeals handed down its decision in *Wetzel v. Arizona State Real Estate Dep't,* 151 Ariz. 330, 727 P.2d 825 (App.1986), *cert. denied,* 482 U.S. 914, 107 S.Ct. 3186, 96 L.Ed.2d 674 (1987). That decision approved the offensive use of nonmutual collateral estoppel.

Citing *Wetzel,* Davis moved for summary judgment, but his motion was denied.

The case was set for trial. The district judge informed the parties by letter that he considered the matter of personal jurisdiction to have been decided on the Rule 12(b)(2) motion, and that it would not be an issue at trial.

At the trial to the bench, Davis renewed his summary judgment motion. By this time, the Arizona Supreme Court had denied review[3] of the *Wetzel* case. The district judge granted the motion, and entered judgment for Davis.

## III. DISCUSSION

### A. *Personal Jurisdiction Over Smith and Miller*

#### 1. Arizona Law on Collateral Estoppel

Davis argues on appeal that the basis for the district court's assertion of personal jurisdiction may have been collateral estoppel, inasmuch as the Arizona Court of Appeals held three times, in cases with nearly identical facts,[4] that *in personam* jurisdiction was proper over these same two individual defendants. However, the record before us shows that even if the collateral estoppel doctrine served as the basis for the granting of plaintiff's summary judgment motion, that ruling related solely to the substantive securities law question, and did not involve the jurisdictional dispute.

Davis maintains on appeal that regardless of what reasoning lay behind the district court's ruling, we should nonetheless apply collateral estoppel to affirm the ruling. Appellants argue that Arizona law does not permit the offensive use of non-

---

**2.** *See Pistorio v. Metro Prods., Inc.,* No. C–517215, slip op. (Ariz.App. Jun. 2, 1987); *Bodell v. Metro Prods., Inc.,* No. C–524297, slip op. (Ariz.App. Jun. 2, 1987); and *Sullivan v. Metro Prods., Inc.,* 150 Ariz. 573, 724 P.2d 1242 (App. 1986), *review denied, id., cert. denied,* 479 U.S. 1102, 107 S.Ct. 1334, 94 L.Ed.2d 185 (1987). The same offering materials, Production Service Agreement, and management agreement with Investor's were used in all of these cases. None of these cases involved any additional in-state activity by Smith or Miller. In none of those cases did the Arizona Supreme Court act to change the result.

**3.** It appears that the Arizona Supreme Court's refusal to review the decision of an intermediate appeals court is more significant than such refusal on the part of the United States Supreme Court. Such refusal "usually attests [the Arizona Supreme Court's] approval of the result reached by the court of appeals." *Hagen v. United States Fidelity & Guar. Ins. Co.,* 138 Ariz. 491, 491, 675 P.2d 1310, 1310 (1984).

**4.** *See supra* note 2.

mutual collateral estoppel. Davis argues to the contrary, that the current law in Arizona allows him to prevail through offensive use of the doctrine of collateral estoppel.

The parties dispute vigorously the recent developments in Arizona law on this issue and their implications. It may well be that Arizona courts are in the process of shifting from the First Restatement view, which does not allow the offensive use of nonmutual collateral estoppel, *see Restatement of Judgments* § 93 (1942), to the view of the Second Restatement, which does. *See Restatement (Second) of Judgments* § 29 (1982); *see also Wetzel,* 727 P.2d 825. Whether this transition has been completed or is still inchoate, however, is a question we need not determine because, as we discuss below, we view personal jurisdiction as a matter that must be independently determined by the federal court.

### 2. Due Process Considerations

Sitting in diversity, we, like the district court, are obliged to follow the applicable state substantive law under familiar principles of federalism. *See Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). According to Davis, this obligation suggests that because *in personam* jurisdiction was found to exist three times by Arizona courts under parallel circumstances,[5] we should hold that it was properly asserted by the district court.

This argument, however, misses the point that a federal court must not fail to address the due process requirements of the federal constitution through blind adherence to a state court's determination of that issue. *See Woods v. Holy Cross Hosp.,* 591 F.2d 1164, 1171–72 (5th Cir. 1979); *cf. also Bittaker v. Enomoto,* 587 F.2d 400, 402 n. 1 (9th Cir.1978) (state's interpretation of federal constitution persuasive but not binding on federal court), *cert. denied,* 441 U.S. 913, 99 S.Ct. 2013, 60

L.Ed.2d 386 (1979). We therefore consider the defendants' contention that the district court's ruling cannot stand because the due process standards of *International Shoe v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), were not met when the district court asserted *in personam* jurisdiction over Smith and Miller as individuals.

The district court did not explain its determination that it had personal jurisdiction over Smith and Miller. Rather, at the early stages of the litigation, it issued an order denying a Rule 12(b)(2) motion based on the pleadings.[6] We assume that the court based its determination on an analysis, conducted by a different judge earlier in the case, of the facts and the parties' allegations in light of the Arizona long-arm statute and due process considerations. This unrecorded analysis apparently occurred at the point at which the earlier judge denied the defendants' motion to dismiss for lack of personal jurisdiction.

In determining whether a court may properly assert personal jurisdiction, two independent inquiries must be undertaken. The first is whether a state jurisdictional statute applies to the facts of the case. The second is whether the exercise of jurisdiction under the terms of that statute comports with the due process requirements of the United States constitution. *Haisten v. Grass Valley Medical Reimbursement Fund, Ltd.,* 784 F.2d 1392, 1396 (9th Cir. 1986).

The statute relied upon here is the Arizona long-arm statute, Ariz.R.Civ.P. 4(e)(2), on the ground that defendants "caused an event to occur in [Arizona] out of which the claim which is the subject of the complaint arose." The "event" appellants allegedly caused to occur in Arizona is the monetary loss Davis suffered by investing in Metro's business. The Arizona courts have held that it is not the initiating act of causation that must occur in Arizona, but rather, the resulting event or effect. *Powder Horn*

---

5. See *supra* note 2.

6. That denial was never reconsidered; the trial judge wrote the lawyers before trial stating that he considered the issue to have been fully determined on the Rule 12(b)(2) motion and that no

further evidence would be taken on the issue at trial. At trial, the judge orally granted plaintiff's summary judgment motion without consideration of the matter of personal jurisdiction.

*Nursery, Inc. v. Soil & Plant Lab., Inc.,* 20 Ariz.App. 517, 520, 514 P.2d 270, 273 (Ariz.App.), *rev. denied, id.* (Ariz.1973). Davis's loss of money clearly meets this requirement.

Arizona's long-arm statute has been interpreted by Arizona courts as permitting jurisdiction as broad as is authorized by the United States Constitution. *Manufacturers' Leases Plan, Inc. v. Alverson Draughon College,* 115 Ariz. 358, 359, 565 P.2d 864, 865 (1977). Thus, the focus of the court's inquiry is on the question whether personal jurisdiction over Smith and Miller as individuals in fact comports with due process.

Where the nonresident defendant does not have substantial or continuous and systematic activities within a state, the court must evaluate the activity of the defendant giving rise to the cause of action. *See Perkins v. Benguet Consol. Mining Co.,* 342 U.S. 437, 446–47, 72 S.Ct. 413, 418–19, 96 L.Ed. 485 (1952). Because Smith and Miller did not have continuous and systematic contacts with Arizona, we examine the specific bases alleged in support of personal jurisdiction. We must make three inquiries: (1) whether Smith and Miller puposefully directed their activities toward or consummated some transaction with the forum or residents thereof; (2) whether the claim made by Davis arises out of the defendants' forum-related activities; and (3) whether the exercise of jurisdiction comports with traditional notions of fair play and substantial justice. *Haisten,* 784 F.2d at 1397; *see Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 472–76, 105 S.Ct. 2174, 2181–84, 85 L.Ed.2d 528 (1985).

We easily conclude that the first two inquiries are affirmatively answered. Metro, an entity controlled by Smith and Miller, sold videotapes to Davis, an Arizona resident. Metro, through its agents, periodically contacted Davis—and other Arizona residents—to collect payments due on the videotape agreements.[7] Davis's claim is directly based on his loss of money as a result of entering into videotape agreements.

However, the answer to the third inquiry is complicated by the fact that Smith and Miller were not personally parties to the videotape agreements, but rather, they entered into the agreements as officers and directors of Metro. Thus, Smith and Miller argue that the existence of jurisdiction over Metro does not confer jurisdiction over them personally. Because their contacts with Arizona resulted from actions taken in their corporate capacity, they argue, they are protected from suit in Arizona by the "fiduciary shield" doctrine.

**3. Fiduciary Shield Doctrine**

■ Under the fiduciary shield doctrine, a person's mere association with a corporation that causes injury in the forum state is not sufficient in itself to permit that forum to assert jurisdiction over the person. *See Weller v. Cromwell Oil Co.,* 504 F.2d 927 (6th Cir.1974); *United States v. Montreal Trust Co.,* 358 F.2d 239 (2d Cir.), *cert. denied,* 384 U.S. 919, 86 S.Ct. 1366, 16 L.Ed.2d 440 (1966); *see also* 4 C. Wright & A. Miller, *Federal Practice and Procedure* § 1069 at 370 (2d ed. 1987). Rather, there must be a reason for the court to disregard the corporate form.

■ The jurisprudential contours of what reasons suffice for the court to disregard the corporate form for jurisdictional purposes are somewhat indistinct. Because the corporate form serves as a shield for the individuals involved for purposes of liability as well as jurisdiction, many courts search for reasons to "pierce the corporate veil" in jurisdictional contexts parallel to those used in liability contexts. Thus, the corporate form may be ignored in cases in which the corporation is the agent or alter ego of the individual defendant, *Dietel v. Day,* 16 Ariz.App. 206, 208, 492 P.2d 455, 457 (App.1972); *Certified Bldg. Prods., Inc. v. National Labor Relations Board,* 528 F.2d 968 (9th Cir.1976); or where there is an identity of interests between the cor-

---

7. These contracts were entered into under facts sufficient under due process analysis to support Arizona jurisdiction over Metro, *see Pistorio,* slip op. at 18; *see also Rollins v. Vidmar,* 147 Ariz. 494, 495–96, 711 P.2d 633, 634–35 (App.1985), and that issue is not presented on appeal.

poration and the individuals. *See Holfield v. Power Chem. Co.*, 382 F.Supp. 388, 393 (D.Md.1974) (identity of interests between corporation and corporate president); *see also* 4 C. Wright & A. Miller, *supra* § 1069 at 372–74. Under Arizona law, fraud has provided a basis for asserting jurisdiction in spite of the corporate shield.[8] *Pistorio,* slip op. at 21; *Parks v. Macro–Dynamics,* 121 Ariz. 517, 591 P.2d 1005 (App.1979); *see also Lakota Girl Scout Council, Inc. v. Havey Fund–Raising Mgt., Inc.,* 519 F.2d 634 (8th Cir.1975) (listing as a factor in determining whether a corporation was the alter ego of its dominant shareholder the fact that the corporation was used to promote fraud).

Although the assertion of personal jurisdiction in general is an issue of constitutional dimensions, the Supreme Court appears to have signalled that the question whether there exists a jurisdictional corporate shield is not such an issue. In *Calder v. Jones,* 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984), the Supreme Court affirmed the assertion of jurisdiction over Calder and South, nonresident defendants whose intentional conduct in a foreign state was calculated to cause injury to the plaintiff, Shirley Jones, in the forum state. Jones sued Calder and South in California, claiming that they had libeled her in an article written and edited by them in Florida. The defendants objected to the district court's exercise of jurisdiction on the ground that their contact with the forum state occurred only in their capacity as employees of the corporation. Both defendants argued that they had "no direct economic stake in their employer's sales in a distant State." 465 U.S. at 784–86, 104 S.Ct. at 1484–85. They analogized themselves to a welder employed in Florida who had worked on a boiler that subsequently exploded in California. The Court, however, distinguished between the general untargeted negligence of the hypothetical welder and the intentional, allegedly tortious actions by the defendants expressly aimed at the forum state. The defendants knew the article "would have a potentially devastating effect upon [Jones].... And they knew that the brunt of that injury would be felt by [Jones] in [California]." *Id.* at 789–90, 104 S.Ct. at 1487.

The *Calder* Court stated, "Petitioners are correct that their contacts with California are not to be judged according to their employer's activities there. On the other hand, their status as employees does not somehow insulate them from jurisdiction. Each defendant's contacts with the forum State must be assessed individually." 465 U.S. at 790, 104 S.Ct. at 1487. The Court echoed these statements in *Keeton v. Hustler Magazine, Inc.:* "It does not of course follow from the fact that jurisdiction may be asserted over Hustler Magazine, Inc., that jurisdiction may also be asserted over either of the other [individual] defendants.... [But] we today reject the suggestion that employees who act in their official capacity are somehow shielded from suit in their individual capacity." 465 U.S. 770, 781 n. 13, 104 S.Ct. 1473, 1482 n. 13, 79 L.Ed.2d 790 (1984). Thus in both *Calder* and *Keeton,* the Supreme Court applied the constitutional due process analysis to the contacts of the individuals concerned; it did not consider the existence of a state-created corporate form to create a due process limit on jurisdiction.

Although Arizona courts previously recognized a corporate shield limit on their long-arm jurisdiction, *see, e.g., Powder Horn Nursery,* 514 P.2d 270, Arizona has more recently focused on corporate officers' individual contacts to assert personal jurisdiction, rather than restricting their jurisdiction to cover the corporate entity only. *See, e.g., Sullivan v. Metro, Pistorio v. Metro,* and *Bodell v. Metro; see also MacPherson v. Taglione,* 158 Ariz. 309, 762 P.2d 596 (Ariz.App.) *rev. denied, id.* (Ariz. 1988).

In *MacPherson,* the plaintiff, a resident of Arizona, had bought rare coins that proved to be inauthentic from a Massachusetts corporation. MacPherson was con-

---

**8.** Appellants suggest that Davis's original allegations of fraud constituted the support for the district court's denial of appellant's Rule 12(b)(2) motion. However, the judgment was finally rendered on a *per se* violation of securities law.

tacted by telephone in Arizona by an agent of the corporation, but she actually purchased the coins in Michigan while on vacation. The president of the corporation, Taglione, was named as a defendant in the resulting suit. The trial court dismissed the suit against Taglione for lack of personal jurisdiction. The court of appeals reversed, stating, "The question is whether the court's exercise of long arm jurisdiction offends 'traditional notions of fair play and substantial justice' embodied in the due process clause of the Fourteenth Amendment." 762 P.2d at 599 (citation omitted). The court took note of the facts that the corporation conducted business nationwide and had solicited MacPherson's purchases in Arizona. *Id.* It also found important the fact that Taglione was president of the corporation and had "purposely directed his activities at residents of [Arizona]." *Id.* The court specifically rejected Taglione's argument "that jurisdiction should not be exercised over him because he [was] only an employee of the corporation," *id.*, and concluded that MacPherson had made out a *prima facie* case that Taglione was subject to Arizona's jurisdiction.

Accordingly, we conclude that because the Arizona long-arm statute extends to the limit of constitutional due process, *Manufacturers' Lease Plan*, 565 P.2d 864, and because it is not equitably limited by the fiduciary shield doctrine, the reach of long-arm jurisdiction in Arizona is effectively stretched by the reasoning of *Calder* and *Keeton*. *Cf. Nordic Bank PLC v. Trend Group, Ltd.*, 619 F.Supp. 542, 569 n. 30 (S.D.N.Y.1985) (citing *Calder* and *Keeton* in stating that "the [fiduciary shield] doctrine is ... inapplicable in an action brought under RICO or another federal statute that extends jurisdiction to the limits of due process"). Thus, Arizona's long-arm statute may, consistent with constitutional due process, allow assertion of personal jurisdiction over officers of a corporation as long as the court finds those officers to have sufficient minimum contacts with Arizona. *See Retail Software Servs., Inc. v. Lashlee*, 854 F.2d 18, 22–23 (2d Cir.1988) (In case decided after New York Court of Appeals had held the fiduciary shield doctrine not to be a limitation on the New York long-arm statute, court upheld jurisdiction over California defendants who were officers of the corporate defendant. The court found the corporation to have "engaged in purposeful activities in New York" by selling fraudulent franchises, and that the officers "both benefitted from those activities and exercised extensive control over [the corporation.]").

We therefore view the correct jurisdictional inquiry to be into the contacts that Smith and Miller each had with Arizona relative to this dispute, and reject their argument that they are necessarily protected from jurisdiction by a fiduciary shield.

### 4. Smith's and Miller's Contacts

Although Smith's and Miller's contacts found to be sufficient by the Arizona courts in *Sullivan v. Metro, Pistorio v. Metro,* and *Bodell v. Metro* were set out in those opinions, the district court record contains no such enumeration and analysis. However, we see no need to remand; the existence *vel non* of personal jurisdiction is a question of law when the underlying facts are undisputed. *Haisten*, 784 F.2d at 1396. We may uphold a conclusion of law even if reached by the district court for the wrong reason. *Jett v. Sunderman*, 840 F.2d 1487, 1493 (9th Cir.1988).

The record before us shows that Smith and Miller, each 50% shareholders of Metro and its only officers and directors, purposefully directed their activities toward Arizona when Metro solicited business from Arizona residents. *See Calder*, 465 U.S. at 789–90, 104 S.Ct. at 1487; *Burger King v. Rudzewicz*, 471 U.S. 462, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985). Smith and Miller met with Allen, an Arizona resident whose business was in Arizona, to discuss the opportunity for his clients to invest in Metro, and offered a financial incentive for Allen to find investors. They "clearly acted with the intent to induce Allen to obtain purchasers of the tapes in Arizona, [which] resulted in six agreements with Arizona residents." *Sullivan v. Metro*, 150 Ariz. at 577, 724 P.2d

at 1246. Their acts did not amount to "untargeted negligence," but rather, Miller and Smith should reasonably have known that their actions "could have [an] effect on the plaintiff, ... and that the brunt of the injury caused by their actions would be felt in [Arizona]." *Brainerd v. Governors of Univ. of Alberta*, 873 F.2d 1257, 1259–60 (9th Cir.1989) (citing *Calder*). Miller and Smith could have reasonably foreseen that they would be haled into Arizona's courts if the investments by Allen's clients in Arizona resulted in litigation.

Furthermore, they had fair warning that they could be held *personally* liable for securities violations. *See Shaffer v. Heitner*, 433 U.S. 186, 218, 97 S.Ct. 2569, 2587, 53 L.Ed.2d 683 (1977) ("The requirement of fair notice ... includes fair warning that a particular activity may subject a person to the jurisdiction of a foreign sovereign.") (Stevens, J., concurring in the judgment). Under Arizona securities law, "An action ... may be brought against any person, including any dealer, salesman or agent, who made, participated in or induced the unlawful sale or purchase, and such persons shall be jointly and severally liable to the purchaser or seller entitled to maintain such action." A.R.S. § 44–2003 (1987).[9]

Because Smith and Miller purposefully directed their actions toward Arizona, assertion of personal jurisdiction over them is presumed to be reasonable. *See Burger King*, 471 U.S. at 477, 105 S.Ct. at 2184–85. Smith and Miller have not argued that defending themselves in Arizona District Court would be burdensome; nor could they, as they have defended themselves in suits arising out of the Metro scheme several times in Arizona state courts. *See Lake v. Lake*, 817 F.2d 1416, 1421–22 (9th Cir.1987) (listing factors in analysis of reasonableness of jurisdiction). Neither have they addressed any other of the considerations involved in a determination of the reasonableness of jurisdiction: existence of an alternative forum; convenience and effectiveness of relief for the plaintiff; interest of the forum state; efficiency of adjudication; extent of the defendants' purposeful interjection into Arizona; or possibility of conflict with sovereignty. *Id.* We cannot divine any substantial concern respecting any of these considerations.

We therefore find the district court's assertion of personal jurisdiction over Smith and Miller comported with "traditional notions of fair play and substantial justice."[10] *International Shoe Co. v. Washington,*

---

**9.** Similarly, the Second Circuit held that the New York Franchise Sales Act gave the individual defendants "explicit notice" that they could be held individually liable in a suit arising under the Act, by virtue of the Act's provision making corporate officers and directors jointly and severally liable if they "materially aid[ ] in the act [or] transaction constituting the violation." *Retail Software*, 854 F.2d at 21, 23.

**10.** By affirming the district court's assertion of jurisdiction, we follow the signal we perceive *Calder* to send. We recognize that there may conceivably be anomalous consequences to asserting long-arm jurisdiction over corporate officers for reasons distinct from those that would allow the corporate veil to be pierced in questions of liability. These potential consequences would arise where sufficient minimum contacts existed to permit jurisdiction over the individual defendant, but where the substantive prerequisites do not exist for liability to be imposed on the individual in his personal capacity. *See Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 902 (2d Cir.1981). This was not a problem in *Calder;* the purposeful action taken by the individual defendants that constituted mini-

mum contacts and made a suit against them foreseeable were the very actions upon which liability was based. Likewise here—although Smith and Miller do not specifically dispute their personal liability—we perceive no anomaly. The fact that Smith and Miller are the sole shareholders of Metro and its only officers, together with their actual participation in the scheme, is sufficient to support the liability imposed upon them. A.R.S. § 44–2003.

Indeed, it may be that the "purposeful availment" requirement in a due process inquiry serves to resolve any theoretical divergence between substantive liability and amenability to jurisdiction. *See Escude Cruz v. Ortho Pharmaceutical Corp.*, 619 F.2d 902, 907 (1st Cir.1980) ("Cases which have found personal liability on the part of corporate officers have typically involved instances where the defendant was the 'guiding spirit' behind the wrongful conduct, ... or the 'central figure' in the challenged corporate activity.") (citations omitted). Thus our holding, that no constitutional imperative prevents long-arm jurisdiction over Smith and Miller, represents a cautious step in construing *Calder*. What path future steps will shape we leave for development in other cases.

326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945). Our conclusion is consistent not only with due process, but also with the application of the Arizona long-arm statute by Arizona courts to these individuals in virtually identical circumstances. Our jurisdictional holding rests not on *res judicata* or collateral estoppel, but rather, on the constitutional requirements for assertion of *in personam* jurisdiction.

### B. The Videotape Sales Agreements As Investment Contracts

In granting summary judgment, the district court held that Metro, Smith, and Miller were liable for the sale of unregistered securities by unlicensed salesmen because it found the sales agreements to be investment contracts, and thus securities. We review this determination *de novo*. *Darring v. Kincheloe*, 783 F.2d 874, 876 (9th Cir.1986). We apply the same standard as that used by the trial court: whether there is any genuine issue of material fact and whether the substantive law was correctly applied. *Id.*

#### 1. Issue of Material Fact

Smith and Miller assert that questions of material fact existed, precluding the entry of summary judgment. They contend that there was a dispute as to whether a "common enterprise" existed, whether Davis was relying primarily on the efforts of others to derive a profit, and the extent to which Davis had power of control over the program. However, they fail to point to any material *factual* dispute, disagreeing instead with the legal implications drawn by the district court in its analysis of the contractual arrangement.

#### 2. Substantive Law

The task of a federal court sitting in diversity is to approximate state law.

*Gee v. Tenneco, Inc.*, 615 F.2d 857 (9th Cir.1980). The substantive analysis applied by the Arizona Court of Appeals in *Sullivan v. Metro, Pistorio v. Metro*, and *Bodell v. Metro* to the very agreement at issue here serves as forceful precedent for concluding that the videotape agreements constituted investment contracts. Moreover, other Arizona cases have held schemes similar to Metro's to be investment contracts, looking to the same factors as did *Sullivan* and the related cases. *See, e.g., Vairo v. Clayden*, 153 Ariz. 13, 734 P.2d 110 (App.1987) (tax shelter involving sale of master videotapes from company other than Metro); *Daggett v. Jackie Fine Arts, Inc.*, 152 Ariz. 559, 733 P.2d 1142 (App.1987), *review denied, id.* (tax shelter involving sale of prints from "art master").

In the *Sullivan, Pistorio*, and *Bodell* cases, the Arizona courts properly applied the three-part test for whether a transaction constitutes an investment contract set out in *Securities and Exchange Commission v. W.J. Howey Co.*, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946).[11] The *Howey* test requires that (1) individuals be led to invest money (2) in a common enterprise (3) with the expectation that the profits they earn will be derived solely[12] from the efforts of others. We perceive no significant differences between the facts at issue or the arguments made here, and those of *Sullivan v. Metro, Pistorio v. Metro*, and *Bodell v. Metro*. Nor do the defendants distinguish these cases in any way.

Instead, Smith and Miller attempt to support their contentions by quoting language from the Production Service Agreement and the contract with Investor's. It is well established that courts look beyond contractual language to economic realities in determining whether a transaction is an

---

**11.** Arizona courts have adopted this definition of an investment contract for the purpose of Arizona securities law. *Rose v. Dobras*, 128 Ariz. 209, 624 P.2d 887 (App.1981).

**12.** Later applications of the *Howey* test have developed a less restrictive third prong. The profits need not be derived *solely* from the efforts of others, but rather, "a more realistic test" applies, to wit, "whether the efforts made by

those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise." *SEC v. Glenn W. Turner Enters., Inc.*, 474 F.2d 476, 482 (9th Cir.), *cert. denied*, 414 U.S. 821, 94 S.Ct. 117, 38 L.Ed.2d 53 (1973), *cited in Sullivan v. Metro Prods.*, 724 P.2d at 1246.

investment contract. *Tcherepnin v. Knight,* 389 U.S. 332, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967). Referring to contracts essentially indistinguishable from those at issue here, the *Sullivan* court took account of the economic realities:

> Although the brochure speaks in terms of the purchasers distributing the tapes themselves as though that were truly an option, the production service agreement requires the purchasers to hire an agent to handle distribution within 30 days of signing the agreement. Any revenues the purchasers realize from their investments would thus be the result of essential managerial efforts of others. The trial court found that the "investments were offered without regard to the experience or sophistication of the investors in the television industry. It was not intended or expected by Metro or its salesmen that the typical investor would attempt to market his tapes himself."

*Sullivan,* 724 P.2d at 1246. The district court agreed with this analysis of the economic realities.

We conclude that the district court correctly followed the *Sullivan, Pistorio,* and *Bodell* cases when it determined that the videotape agreements were investment contracts.

AFFIRMED.