James L. **TICKNOR;** Janet Ticknor; Larry Ticknor; Tickco Holding, L.L.C.; Ticknor Lodging Corporation, Plaintiffs–Appellees,

v.

**CHOICE HOTELS INTERNATIONAL, INC.,** Defendant–Appellant.

No. 00–35048.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted July 19, 2001

Filed Sept. 12, 2001

---

**15.** The defendants' motion for summary reversal is, obviously, denied.

Patrick M. Sullivan; Butte, Montana; Attorney for the appellant.

Robert K. Baldwin; Bozeman, Montana; Attorney for the appellee

Before: PREGERSON, TASHIMA and THOMAS, Circuit Judges.

THOMAS, Circuit Judge:

In this appeal, we consider whether the Federal Arbitration Act preempts state law governing the unconscionability of adhesion contracts. Under the circumstances presented by this case, we conclude that it does not, and we affirm the order of the district court denying the motion to compel arbitration.

I

In 1998, James Ticknor and the Ticknor Lodging Corporation (collectively, "Ticknor") executed an Econo Lodge Franchise Agreement ("Franchise Agreement") with Choice Hotels, International, Inc. ("Choice") for the operation of a hotel located in Bozeman, Montana. In return for the payment of franchise fees, Ticknor was granted a non-exclusive license to use the Econo–Lodge mark in connection with the motel. In addition, Choice was to integrate the motel into its national advertising and reservations system and provide other assistance. James Ticknor's parents, Janet and Larry Ticknor and Tickco Holding LLC (their company) guaranteed the performance of the Agreement. Ticknor and Ticknor Lodging also executed the separate guaranty agreement ("Guaranty Agreement").

The Franchise Agreement, which was a pre-printed standard form instrument drafted by Choice, contained an arbitration clause providing:

> Except for our claims against you for indemnification, actions for collection of moneys owed us under this Agreement, or actions seeking to enjoin you from using the Marks in violation of this Agreement, any controversy or claim relating to this Agreement, or the breach of this Agreement, including any claim that this Agreement or any part of this Agreement is invalid, illegal, or otherwise voidable or void, will be sent to final and binding arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association. The arbitrator will apply the substantive laws of Maryland, without reference to its conflict of laws provision. Judgment on the arbitration award may be entered in any court having jurisdiction. If any party fails to appear at any properly noticed arbitration proceeding, an award may be entered against the party, notwithstanding its failure to appear. Any arbitration will be conducted at our headquarters office in Maryland.

The Franchise Agreement also contained a choice of law provision that stated: "This Agreement becomes valid only when we have signed it, and it will be interpreted under the substantive laws of Maryland, not including its conflict of laws provision."

The Guaranty Agreement did not contain either an arbitration clause or a choice of law provision. However, it did provide in relevant part that:

> the undersigned do jointly and severally, unconditionally and irrevocably, guaranty to Choice that Ticknor Lodging Corporation ... and James L. Ticknor, Individually, Jointly and Severally, ... will

perform throughout the term of the Agreement each and every covenant, payment or obligation on the part of the Franchisee contained and set forth in said Agreement.

Subsequently, the parties executed two contract addendums drafted by Choice. The first reduced the amount of liquidated damages potentially payable. The second required Ticknor to make certain facility improvements, but allowed him to operate the motel pending implementation of some of those upgrades. According to Ticknor, Choice had promised to provide technical and financial assistance in the renovation of the motel exterior through its "Signature Exterior Renovation Program."

The ink was hardly dry on the Franchise Agreement when disputes arose. Choice canceled the "Signature Exterior Renovation Program," which Ticknor claims was a material inducement to his assent to the Franchise Agreement. In addition, Ticknor alleges that the Choice reservation system was flawed, resulting in overbookings. As a result of these disagreements, Ticknor suspended payment of the franchise fee. Choice thereupon notified Ticknor that it was suspending the Franchise Agreement. Choice also filed a demand for arbitration with the American Arbitration Association ("AAA"), whereupon Ticknor sought and received a state court temporary restraining order prohibiting Choice from proceeding with arbitration. Choice then removed the state court action to federal court and filed a motion to dismiss or, alternatively, to compel arbitration. The district court declined Ticknor's application for a temporary restraining order. Choice withdrew its arbitration request with the AAA. After an evidentiary hearing, the district court denied Choice's motion to dismiss and alternative motion to compel arbitration. This appeal followed.

■■■ We review *de novo* a district court's order denying a petition to compel arbitration, including its interpretation of the validity and scope of the arbitration clause. *Chiron Corp. v. Ortho Diagnostic Sys. Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000). "[Q]uestions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983). We review the factual findings underlying the district court's decision for clear error. *Woods v. Saturn Distrib. Corp.*, 78 F.3d 424, 427 (9th Cir.1996). The interpretation and meaning of contract provisions are questions of law we review *de novo*. *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 719 (9th Cir.1999). We also review *de novo* the district court's decision concerning the appropriate choice of law. *Aceves v. Allstate Ins. Co.*, 68 F.3d 1160, 1167 (9th Cir.1995).

## II

■■ The Federal Arbitration Act ("FAA") provides that written agreements to arbitrate disputes arising out of transactions involving interstate commerce "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The FAA " 'creates a body of federal substantive law of arbitrability,' enforceable in both state and federal courts and pre-empting any state laws or policies to the contrary." *Cohen v. Wedbush, Noble, Cooke, Inc.*, 841 F.2d 282, 285 (9th Cir.1988) (quoting *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 24, 103 S.Ct. 927).

■■■ Despite the "liberal federal policy favoring arbitration agreements," *Green Tree Fin. Corp.-Alabama v. Randolph*, 531 U.S. 79, 81, 121 S.Ct. 513, 148 L.Ed.2d 373 (2000), state law is not entirely displaced

from federal arbitration analysis. Under § 2, "state law, whether of legislative or judicial origin, is applicable *if* that law arose to govern issues concerning the validity, revocability, and enforceability of contracts generally." *Perry v. Thomas,* 482 U.S. 483, 492 n. 9, 107 S.Ct. 2520, 96 L.Ed.2d 426 (1987) (emphasis in original). "Thus, generally applicable contract defenses, such as fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements without contravening § 2." *Doctor's Assocs., Inc. v. Casarotto,* 517 U.S. 681, 686, 116 S.Ct. 1652, 134 L.Ed.2d 902 (1996). "Courts may not, however, invalidate arbitration agreements under state laws applicable only to arbitration provisions." *Id.* Thus, "Congress precluded States from singling out arbitration provisions for suspect status, requiring instead that such provisions be placed 'upon the same footing as other contracts.'" *Id.* (quoting *Scherk v. Alberto–Culver Co.,* 417 U.S. 506, 511, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974)). In short, as long as state law defenses concerning the validity, revocability, and enforceability of contracts are generally applied to all contracts, and not limited to arbitration clauses, federal courts may enforce them under the FAA.

▇▇ Of course, the role of the federal courts in these circumstances is limited: the sole question is whether the arbitration clause at issue is valid and enforceable under § 2 of the Federal Arbitration Act. *Chiron Corp.,* 207 F.3d at 1130. In making this determination, federal courts may not address the validity or enforceability of the contract as a whole. *Prima Paint v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 401, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967).

### III

▇▇ Ticknor has raised the state law defense of unconscionability to Choice's motion to compel arbitration. Before as-

sessing whether that defense is viable, we must determine which state's law applies. Federal courts sitting in diversity look to the law of the forum state in making a choice of law determination. *Sparling v. Hoffman Constr. Co., Inc.,* 864 F.2d 635, 641 (9th Cir.1988); *see also Zinser v. Accufix Research Institute, Inc.,* 253 F.3d 1180 (9th Cir.2001). Thus, because the complaint was filed in Montana, Montana's choice of law rules apply.

▇▇ Montana applies the Restatement (Second) of Conflict of Laws § 187(2) "when [it is] faced with the question of whether to give effect to a contractual choice of law by the parties." *Keystone, Inc. v. Triad Sys. Corp.,* 292 Mont. 229, 971 P.2d 1240, 1242 (1998). That section provides, in relevant part, that:

> The law of the state chosen by the parties to govern their contractual rights and duties will be applied ... unless ...
>
> (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the role of section 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

Restatement (2d) of Conflict of Laws § 187(2) (1988).

▇▇ Montana courts conflate the latter two inquiries and find that whichever state has a materially greater interest under § 188 is also the state whose law would apply absent an effective choice of law provision. *See Keystone,* 971 P.2d at 1242. Thus, to overcome the parties' choice of law contractual provisions, (1) Montana must have a materially greater interest in the transaction than Maryland and (2) application of the law of Maryland must be contrary to a fundamental public policy of

Montana in the determination of the arbitration clause's validity.

▮ To determine which state has a materially greater interest, Montana law relies on the five factors enumerated in Restatement (Second) of Conflict of Laws § 188, namely:

(a) the place of contracting;

(b) the place of negotiation of the contract;

(c) the place of performance;

(d) the location of the subject matter of the contract; and

(e) the domicile, residence, nationality, place of incorporation and place of business of the parties.

*Keystone,* 971 P.2d at 1242.

▮ After applying these factors, the district court determined that Montana has a materially greater interest than Maryland in the transaction. In making this analysis, the district court made the following factual findings:

(a) The contract was signed in both Montana and Maryland.

(b) Negotiations took place between James Ticknor and a Choice representative in Montana.

(c) Most of the contract obligations were performed in Montana (i.e., the operation of the hotel by the Ticknors), except that the Ticknors mailed fees to Maryland.

(d) The subject matter of the contract—the Econo–Lodge motel—is located in Butte, Montana.

(e) The Ticknors live and work in Montana

These findings were inaccurate in some respects: James Ticknor executed the contract not in Montana, but on vacation in Mexico while he was a Colorado resident; Larry and Janet Ticknor were residents of South Dakota, not Montana; and the motel is located in Bozeman—not Butte. However, the discrepancies do not alter our agreement with the district court's ultimate conclusion that Montana has a materially greater interest than Maryland in the transaction. The purpose of the contract was to establish and govern operation of a motel franchise in Montana. The motel was operated in Montana. The only face-to-face meeting between Choice representatives and James Ticknor occurred in Montana. James Ticknor has never traveled to Maryland. Maryland provided an address for depositing payments, but little else. As in *Keystone,* "the contract was performed almost exclusively in Montana" and "the subject matter of the contract is located in Montana." 971 P.2d at 1243. Thus, under Montana choice of law principles, Montana has a materially greater interest in the transaction than does Maryland.

▮ Having determined this, the second question is whether application of the law of Maryland in this context would be contrary to a fundamental public policy of Montana. Assuming, *arguendo,* that Maryland law would differ from Montana's on the salient question, application of foreign law would contradict a fundamental public policy of Montana. The Montana Supreme Court has taken a broad view of what constitutes public policy, declaring that "[f]or choice of law purposes, the public policy of a state is simply the rules, as expressed in its legislative enactments and judicial decisions, that it uses to decide controversies." *Phillips v. Gen. Motors Corp.,* 298 Mont. 438, 995 P.2d 1002, 1015 (2000). The Montana Supreme Court has also expressed antipathy toward choice of law provisions that might require enforcement of a contractual provision that would be invalid under Montana law. *See, e.g., Miller v. Fallon County,* 222 Mont. 214, 721 P.2d 342, 347 (1986) (holding that con-

tracts with non-Montana choice of law provisions that violate public policy are "the types of contracts Montana will refuse to recognize regardless of their origin").

 In the context of adhesion contracts, the Montana Supreme Court has determined expressly that it will not enforce an arbitration clause that "lacks mutuality of obligation, is one-sided, and contains terms that are unreasonably favorable to the drafter." *Iwen v. U.S. West Direct,* 293 Mont. 512, 977 P.2d 989, 996 (1999). In short, an unconscionable arbitration clause in an adhesion contract is unenforceable in Montana as a matter of public policy. Thus, the district court did not err in concluding that the Montana Supreme Court would likely hold that another state's contrary interpretation of contract unconscionability would contradict a fundamental public policy of Montana. For these reasons, the district court also properly concluded that the question of whether the arbitration clause was unconscionable should be determined by application of Montana law.

## IV

 "The task of a federal court in a diversity action is to approximate state law as closely as possible in order to make sure that the vindication of the state right is without discrimination because of the federal forum." *Gee v. Tenneco, Inc.,* 615 F.2d 857, 861 (9th Cir.1980). In doing so, federal courts are bound by the pronouncements of the state's highest court on applicable state law. *Davis v. Metro Productions, Inc.,* 885 F.2d 515, 524 (9th Cir.1989). "Where the state's highest court has not decided an issue, the task of the federal courts is to predict how the state high court would resolve it." *Dimidowich v. Bell & Howell,* 803 F.2d 1473, 1482 (9th Cir.1986), *modified at* 810 F.2d 1517 (9th Cir.1987). In assessing how a

state's highest court would resolve a state law question—absent controlling state authority—federal courts look to existing state law without predicting potential changes in that law. *Moore v. R.G. Industries, Inc.,* 789 F.2d 1326, 1327 (9th Cir. 1986).

 The district court concluded that, under Montana law, the arbitration provision in the Franchise Agreement is unenforceable as unconscionable. In making that determination, the district court relied on the Montana Supreme Court's recent decision in *Iwen,* 977 P.2d at 994–95, in which the Montana Supreme Court invalidated an arbitration agreement almost identical to the provision at issue.

 To determine the enforceability of a specific contractual provision under *Iwen,* a Montana court must first decide whether the contract is one of adhesion. 977 P.2d at 994–95. If so, then the provision will not be enforced against the weaker contracting party if it is (1) not within that party's reasonable expectations, or (2) if within those expectations, it is unduly oppressive, unconscionable, or against public policy. 977 P.2d at 994–95 (citing *Passage v. Prudential–Bache Sec., Inc.,* 223 Mont. 60, 727 P.2d 1298, 1302 (1986)).

The district court concluded that the Franchise Agreement was a contract of adhesion under Montana law, and we find no error in that determination. Like the contract at issue in *Iwen,* the Franchise Agreement was a standardized, form agreement that Ticknor was forced to accept or reject without negotiation. Choice argues that the presence of two addenda indicate that the contract was negotiable. However, the record belies this. The addenda were drafted by Choice after a site visit and presented to Ticknor in the same "take it or leave it" manner as the original Franchise Agreement. There is no evi-

dentiary support in the record for Choice's argument that Ticknor negotiated the changes embodied in the addenda. In fact, Ticknor testified that he had not requested Addendum No. 1, which reduced Ticknor's liquidated damages, and that it was added by Choice unilaterally "because of the disagreements they'd had with franchisees in the past." He also testified that the second addendum, which listed specific changes and additions Ticknor was required to make to the hotel, was created after Rod McKee, one of Choice's management personnel, inspected the Bozeman hotel site without Ticknor's presence or input. To dispute this, Choice submitted the affidavit of its Senior Vice President and General Counsel, Michael J. Desantis, stating that, "[a]ccording to [Choice's business] records, plaintiffs ... negotiated several changes to [the Agreement]." However, Desantis did not participate in any such negotiations (Ticknor had never even met him), and Choice did not present any of the business records that purportedly reflected the negotiations. Given these facts, we conclude that the district court did not err in concluding that the Franchise Agreement was an adhesion contract under Montana law.

■ The fact that a contract is one of adhesion is not dispositive under Montana law. *Passage v. Prudential–Bache Sec., Inc.*, 223 Mont. 60, 727 P.2d 1298, 1302 (1986) ("We conclude that even if the customer agreement form is an adhesion contract, there is nothing in the record and no compelling law to prevent enforcement of the arbitration clause."). The second step in the *Iwen* analysis is to ascertain whether the contract is (1) not within that party's reasonable expectations, or (2) if within those expectations, it is unduly oppressive, unconscionable, or against public policy. 977 P.2d at 994–95. Here, the district court concluded that the arbitration clause was unconscionable under Montana law because it required binding arbitration of the weaker bargaining party's claims, but allowed the stronger bargaining party the opportunity to seek judicial remedies to enforce contractual obligations. There is no requirement under Montana law that "arbitration agreements must contain mutual promises that give parties identical rights and obligations or that the parties must be bound in the exact same manner." *Id.* at 996. However, "the disparities in the rights of the contracting parties must not be so one-sided and unreasonably favorable to the drafter ... that the agreement becomes unconscionable and oppressive." *Id.*

The arbitration clause in this case allowed Choice to bring its claims against Ticknor into state or federal court, yet forced Ticknor to submit all claims to binding arbitration at Choice's headquarters in Maryland. *Iwen* involved an almost identical situation, leading the Montana Supreme Court to reach the conclusion that the clause was unenforceable. *Id.* at 993. Thus, applying *Iwen*, the arbitration provision in this case "lacks mutuality of obligation, is one-sided, and contains terms that are unreasonably favorable to the drafter." *Id.* at 996.

Choice suggests that, because it initially sought arbitration as to whether franchise fees were due—which it was not obligated to do under the Franchise Agreement—mutuality of arbitration remedy exists under the contract. However, it is the contractual terms, not the subsequent behavior of the parties, that determines whether a clause may be deemed unenforceable as unconscionable. *See id.* In addition, Choice has withdrawn its request for arbitration of its affirmative claims, removing the factual underpinnings of its argument.

It is arguable that Montana law as established by *Iwen* and its predecessors is limited to consumer contracts—where the inequality of bargaining power is readily apparent—and does not apply to a commercial transaction between supposedly sophisticated business owners. In the past, Montana law has occasionally evolved in similar contexts. *Compare Dunfee v. Baskin–Robbins, Inc.* 221 Mont. 447, 720 P.2d 1148, 1153 (1986), *with Story v. City of Bozeman,* 242 Mont. 436, 791 P.2d 767, 773 (1990). However, as written, *Iwen* is not limited to the consumer context; in fact, it applied "generally applicable contract defenses." 977 P.2d at 944. In addition, the Montana Supreme Court had previously held that "[o]ppression and a disparity of bargaining power are the indicia of unconscionability relating to a sales contract between two business professionals." *In re Michael,* 264 Mont. 261, 871 P.2d 272, 275 (1994) (citing *All–States Leasing v. Top Hat Lounge,* 649 P.2d 1250, 1253 (1982)). Thus, it would be entirely speculative to conclude that the Montana Supreme Court might in the future be inclined to "review the current state of the law and to make midcourse corrections." *Story,* 791 P.2d at 772. In analyzing state law in diversity cases, we must take the law as we find it—not how we might imagine that it might or should evolve. *Moore,* 789 F.2d at 1327.

In view of these considerations, we conclude that the district court correctly determined that the Montana Supreme Court would likely hold that the arbitration provision of the Franchise Agreement was unenforceable as unconscionable under Montana law.

## V

The fact that the arbitration provision is unenforceable under Montana law does not end our inquiry; we must also determine whether Montana's construction of the unconscionability of arbitration clauses is preempted by the Federal Arbitration Act. That analysis is guided by the Supreme Court's decision in *Doctor's Associates,* another case originating from Montana. Under *Doctor's Associates,* "generally applicable contract defenses, such as fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements without contravening § 2." 517 U.S. at 687, 116 S.Ct. 1652. However, "[c]ourts may not ... invalidate arbitration agreements under state laws applicable *only* to arbitration provisions." 517 U.S. at 687, 116 S.Ct. 1652 (emphasis in original). In other words, state legislation specifically aimed at arbitration agreements is preempted by the Federal Arbitration Act. In all situations where arbitration provisions are "placed upon the same footing as other contracts," *see id.* (internal quotation marks and citation omitted), state law applies.

■■■ The Montana Supreme Court addressed the limitations of *Doctor's Associates* in *Iwen,* explaining that Montana law pertaining to the unconscionability of arbitration clauses was the result of the "application of general principles that exist at law or in equity for the revocation of any contract." 977 P.2d at 996. Thus, Montana law concerning arbitration clauses in adhesion contracts does not run afoul of *Doctor's Associates.*

■■■ The Supreme Court's decision in *Doctor's Associates* does, however, cause us to reconsider our prior decisions in *Cohen v. Wedbush, Noble, Cooke, Inc.,* 841 F.2d 282, 286 (9th Cir.1988), and *Bayma v. Smith Barney, Harris Upham and Co.,* 784 F.2d 1023 (9th Cir.1986). Because certain aspects of *Cohen* and *Bayma* cannot be reconciled with *Doctor's Associates,* we must overrule them insofar as they

hold that state law adhesion contract principles may not be invoked to bar arbitrability of disputes under the Arbitration Act. *See Interactive Flight Techs., Inc. v. Swissair Swiss Air Transport Co., Ltd.,* 249 F.3d 1177, 1179 (9th Cir.2001) (applying rule that three-judge panels may depart from circuit precedent that is inconsistent with an intervening Supreme Court decision).

## VI

In sum, the district court did not err in denying the motion to dismiss or, in the alternative, to compel arbitration. The arbitration clause in the Franchise Agreement was unenforceable as unconscionable under Montana law, which was not preempted by the Federal Arbitration Act.

**AFFIRMED.**

TASHIMA, Circuit Judge, dissenting:

Because I do not believe that the contract at issue was an adhesion contract or that its arbitration clause was so one-sided as to make it unconscionable, I respectfully dissent. The arbitration clause does not violate Montana's public policy; therefore, Maryland law should apply. Because I also conclude that Maryland law would not prevent the enforcement of the arbitration clause, I would reverse the district court's denial of Choice's motion to dismiss or to compel arbitration.[1]

The concept of adhesion first arose in the insurance context, *see Fitzgerald v. Aetna Ins. Co.,* 176 Mont. 186, 577 P.2d 370, 373 (1978) (finding "insurance policy [to be] an adhesion contract"), but has since been applied to other areas. *See, e.g., Anderson v. Baker,* 196 Mont. 494, 641 P.2d 1035, 1039 (1982) (consumer and bank); *Passage v. Prudential–Bache Sec., Inc.,* 223 Mont. 60, 727 P.2d 1298, 1301 (1986) (finding a contract of adhesion where consumer was "faced with an industry wide practice of including Arbitration Clauses in standardized brokerage contracts" and thus "face[d] the possibility of being excluded from the securities market unless he accept[ed] a contract with such an agreement to arbitrate"); *Iwen v. U.S. West Direct,* 293 Mont. 512, 977 P.2d 989, 995 (1999) (finding a contract of adhesion between a consumer and telephone company because consumer had no opportunity to negotiate agreement for advertising in the Yellow Pages). As these cases demonstrate, however, Montana has used the adhesion doctrine to protect unsophisticated *consumers* in consumer transactions with no meaningful choice. The rule of adhesion has never been applied to commercial contracts between sophisticated business organizations.[2]

Plaintiffs are not unsophisticated "consumers" under any definition of the term and this is not a consumer transaction. Ticknor Lodging Corp., the contracting

---

**1.** Although not entirely free from doubt, I accept for purposes of this dissent the majority's conclusion that the judicially-created Montana rule, making one-sided arbitration clauses in adhesion contracts unenforceable, does not run afoul of *Doctor's Assoc., Inc. v. Casarotto,* 517 U.S. 681, 116 S.Ct. 1652, 134 L.Ed.2d 902 (1996). *See* maj. op. at 941. Similarly, it is not at all clear, contrary to the majority's assertion, that "Montana has a materially greater interest in the transaction than does Maryland," *id.* at 938, in this action in

which none of the parties is a resident or domiciliary of, or is headquartered in, Montana. I accept this conclusion also, however, for the purposes of the analysis that follows.

**2.** Recognizing that its application of the adhesion doctrine to this commercial contract is anomalous, the majority purports to "take the law as we find it." Maj. op. at 941. In its very next sentence, however, the majority concedes that what it in fact is doing is predicting what "the Montana Supreme Court would likely hold." *Id.*

party and primary plaintiff, owns and operates at least two hotel properties-the one at issue and another in Colorado. Plaintiffs have been operating these properties under franchise agreements with two separate franchisors-one with Prime Rate and the other with Redwood Lodge. Ticknor is an experienced and sophisticated motel franchise operator. Additionally, unlike the plaintiffs in the cases cited above, the Ticknors have not demonstrated that they had no other viable alternatives, *i.e.*, that they "face[d] the possibility of being excluded from the [hotel franchise] market unless [they] accept[ed] a contract with such an agreement to arbitrate." *Passage*, 727 P.2d at 1301.[3] Rather, the record suggests that plaintiffs made a conscious decision to change their affiliation because they believed that the Econo Lodge mark and system would increase their profitability. They willingly accepted the negotiated burdens of the new franchise agreement in return for the expected benefits of the Econo Lodge mark.[4] In other words,

plaintiffs had not only a theoretical, but also an actual, choice. No adhesion contract was crammed down their throat.

This is in direct contrast to the case solely relied upon by the majority. In *Iwen*, the plaintiff-a consumer seeking to place an ad in the Yellow Pages-was faced with a Hobson's choice: either accept the contract as presented, or forego advertising with the only publisher of Yellow Pages in the relevant marketing area. On that fact alone, the case is distinguishable.[5]

Furthermore, even if the contract is one of adhesion, I do not agree that *Iwen* dictates a finding of unconscionability. It is true, as the Majority contends, that the parties' obligations to arbitrate differ in some respect.[6] But should either party wish to proceed against the other for almost any obligation *under the contract*, that party must do so through arbitration. Thus, in that respect, there is complete mutuality of obligations.[7] By comparison,

3. Indeed, plaintiffs presumably could have continued their relationship with Prime Rate.

4. Contrary to the majority's assertion, this was a negotiated transaction. In its choice of law analysis, the district court expressly found that "[n]egotiations took place between James Ticknor and a Choice representative in Montana." Maj. op. at 13086 (emphasis added). The majority does not challenge this finding as clearly erroneous; in fact, it relies on it in concluding that the district court's choice of law analysis was correct.

5. Under the majority's rule, every form contract between parties of even slightly unequal bargaining power is a contract of adhesion-and thus is prone to invalidation. Clearly, the Montana Supreme Court did not envision such a rule.

6. These differences, however, are immaterial to the mutuality analysis. Choice reserved its right to sue for three things: indemnity, trademark enforcement, and moneys owed under the contract. At first glance, it may seem unfair to allow Choice, but not Ticknor, to sue for these breaches. But, Ticknor does

not have a right of indemnification against Choice, nor does it have any trademark rights to protect. It makes sense that indemnification claims are not required to be arbitrated because they invariably arise out of third-party claims which are often already in litigation, where the convenient remedy, if tender of the defense is rejected, is to bring a third-party claim for indemnification. As for trademark claims, the classic remedy for infringement is a federal court injunction, a remedy an arbitrator has no power to enforce. Furthermore, Ticknor could not file an action for "collection of moneys ... under this Agreement" because Choice has no monetary obligations to Ticknor under the contract. Thus, in the mutuality analysis, it makes no difference that Choice is not required to arbitrate these claims. Like the Ticknors, Choice is required to arbitrate all of its other claims under the agreement.

7. For instance, any breach by Ticknor unrelated to payment of monies owed would be arbitrable. Such breaches, for example, could include a failure to follow the aesthetic rules or a failure to maintain insurance.

in *Iwen*, "the sole remedy for either party [was] the cost of the advertisement." 977 P.2d at 996. In enforcing this remedy, the "stronger" party could go to court while the "weaker" party was limited to arbitration. *Id.* at 995–96. The court found that arrangement unconscionable. Once again, the parties' remedies here are not so limited. As such, the clause is not so one-sided as to be unconscionable under Montana law.

We recently noted that the unconscionability analysis has two prongs-procedural unconscionability (the manner and circumstances of contract formation, *i.e.*, was it truly a contract of adhesion), and substantive unconscionability (which analyzes the terms of the agreement, *i.e.*, is so one-sided as to *shock the conscience* ). *Soltani v. West. & So. Life Ins. Co.*, 258 F.3d 1038, 1040 (9th Cir.2001). Although *Soltani* was a case under California law, our analysis here should proceed in the same way, with the same objective. Under such an analysis, this clearly is not an unenforceable adhesion contract-there was neither procedural unconscionability nor substantive unconscionability-and the agreement should be enforced. *See id.*

Because the arbitration clause does not violate Montana law, the parties' choice of law should be enforced and Maryland law applied to this dispute. Maryland courts "treat the mutual promises to arbitrate as an independently enforceable contract. The parties have exchanged mutual promises to arbitrate disputes under the contract and each promise provides consideration for the other." *Holmes v. Coverall N. Am., Inc.*, 336 Md. 534, 649 A.2d 365, 370 (1994). Thus, as long as "there are no infirmities in the formation of the arbitration agreement itself; that is, that there is a mutual exchange of promises to arbi-

trate, ... [the court's] inquiry ceases, as the agreement to arbitrate has been established as a valid and enforceable contract." *Id.* Here, as stated above, there is a mutual exchange of promises to arbitrate mutually-assertable claims. Therefore, under Maryland law, the arbitration clause is enforceable.

The district court's order should be reversed and the case remanded with directions to grant Choice's motion to compel arbitration.

---

Ironically, in fact, in this case, it was Choice who sought to arbitrate *its claims* under the agreement and plaintiffs who are attempting to avoid arbitration of Choice's claims.