**DEFENSE TRAINING SYSTEMS and Katmai Government Services, LLC, Plaintiffs,**

v.

**INTERNATIONAL CHARTER INC. OF WYOMING and Brian J. Boquist, Defendants.**

**No. 3:13–cv–172 JWS.**

United States District Court, D. Alaska.

Signed July 3, 2014.

868

Brewster H. Jamieson, Lane Powell LLC, Anchorage, AK, William K. Walker, Law Offices of William K. Walker, Washington, DC, for Plaintiffs.

James N. Leik, Perkins Coie, LLP, Anchorage, AK, Joshua P. Stump, Harrang Long Gary Rudnick P.C., Portland, OR, for Defendants.

## ORDER FROM CHAMBERS

### [Re: Motion at docket 12]

JOHN W. SEDWICK, District Judge.

### I. BACKGROUND

At docket 12 defendant Brian J. Boquist moved to dismiss the claims against him arguing that his contacts with the State of Alaska are insufficient to support the exer-

cise of personal jurisdiction in this district. Plaintiffs opposed at docket 22. Boquist replied at docket 33. The court's order at docket 41 held that it could not exercise general jurisdiction over Boquist. The order found that the record was not sufficiently developed to determine whether the court could exercise specific jurisdiction over Boquist. The court referred the specific jurisdiction issue to a magistrate judge for purposes of conducting an evidentiary hearing and providing this court with a recommendation on the specific jurisdiction issue pursuant to 28 U.S.C. § 636(b)(1)(B).

The referral was assigned to Magistrate Judge Smith who conducted an evidentiary hearing on February 6 and 7. A transcript of the hearing was filed at dockets 61 and 62. Judge Smith entertained additional briefing. Thereafter, she filed her report at docket 69 recommending that this court exercise specific jurisdiction over defendant Boquist. The time for filing objections to the report has run. No objections have been filed.

## II. STANDARD OF REVIEW

The district court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate." [1] When reviewing a magistrate judge's report and recommendation, the district court conducts *de novo* review of all conclusions of law,[2] and any findings of fact to which objections have been made.[3] Uncontested findings of fact are reviewed for clear error.[4]

## III. DISCUSSION

Having reviewed the file and applied the standard of review articulated above, this court concludes that the magistrate judge has correctly found the facts and applied the law. Judge Smith's report is exceedingly thorough and very well reasoned. Defendant Boquist's contacts with Alaska clearly support the exercise of specific jurisdiction in this case. This court adopts Magistrate Judge Smith's recommended findings and conclusions in her report at docket 69. Based thereon, the motion at docket 12 is **DENIED** with respect to specific jurisdiction. The court will adjudicate plaintiffs' claims.

## INITIAL REPORT AND RECOMMENDATION REGARDING MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION (DOC. 12)

DEBORAH M. SMITH, United States Magistrate Judge.

## I. MOTION PRESENTED

Defendant Brian J. Boquist (Boquist) moves to dismiss the lawsuit against him, asserting that he does not have sufficient contacts with the state of Alaska to permit the United States District Court for the District of Alaska to exercise personal jurisdiction over him. (Doc. 12). Plaintiffs Defense Training Systems (DTS) and Katmai Government Services (Katmai) oppose dismissal. (Doc. 22). This matter was referred to this Court by District Court Judge John Sedwick. When ordering an evidentiary hearing to resolve the question of personal jurisdiction, Judge Sedwick noted that "Plaintiffs likely have es-

---

**1.** 28 U.S.C. § 636(b)(1).

**2.** *Barilla v. Ervin*, 886 F.2d 1514, 1518 (9th Cir.1989), *overruled on other grounds by Simpson v. Lear Astronics Corp.*, 77 F.3d 1170, 1174 (9th Cir.1996).

**3.** 28 U.S.C. § 636(b)(1).

**4.** *Taberer v. Armstrong World Industries, Inc.*, 954 F.2d 888, 906 (3d Cir.1992).

tablished a prima facie case to support specific jurisdiction." (Doc. 41 at 10). However, he pointed out there were direct contradictions between the assertions of David Stephens, Chief Executive Officer of Katmai and DTS, the Plaintiffs, and Defendant Brian Boquist, stating "One of the parties is not being entirely truthful." (Doc. 41 at 11).

This Court held the evidentiary hearing to resolve the factual dispute between the parties regarding Boquist's connections to Alaska. (Docs. 61 and 62, hereinafter "Tr." for Transcript). The issue is ripe for this Court's consideration.

## II. FACTUAL FINDINGS

Following the attacks of September 11, 2001, the United States launched Operations Enduring Freedom and Iraqi Freedom. To prepare U.S. troops for battlefields of Afghanistan and Iraq, the U.S. military hired private contractors to provide training programs that simulated the types of environments that they would encounter when deployed. (Tr. at 11). This litigation arises out of a breakdown in the business relationship between a contractor and subcontractor that provided these services. (Doc. 1–1 at 4–13).

### A. The Formation of the DTS/ICI Relationship

In 2006, Plaintiff Defense Training Systems (DTS) and Defendant International Charter Inc. (ICI) teamed up to procure training-support service contracts from the U.S. military. (Tr. 10, 25, 153–55).

ICI is a closely-held corporation. At all times pertinent to this case, Boquist and his wife owned a minimum of 45 percent of the company, with another 45 percent being held by another ICI executive and business partner, Danny O'Brien, and his wife, and the remaining ten percent owned by the individual "Errol Van Eaton." [1] (Tr. at 140–41).

Defendant ICI had previous experience in military contracting that DTS lacked. During the 1990s, ICI provided aviation services in African conflict zones for the U.S. State Department. (Tr. at 128, 138). For example, during the Liberian Civil War, ICI was hired to locate Russian pilots and aircraft and to protect peacekeepers. (Tr. at 128, 138). By 2004, however, ICI's contracts with the State Department had dried up. (Tr. at 142). The State Department advised Boquist to partner with an Alaska Native or American Indian business, because those entities enjoyed unique privileges [2] over other small businesses in obtaining government contracts under Section 8(a) of the Small Business Act.[3] (Tr. at 142–43).

In late 2004 or 2005, Boquist followed this advice and traveled to Anchorage, Alaska with other ICI managers (including Danny O'Brien) to talk with David Stephens who was, at that time, CEO of Tatitlek Support Services. (Tr. at 7, 9, 143).

---

1. While none of the witnesses could precisely state the exact breakdown in ownership, for purposes of this motion, the Court adopts Boquist's memory of ownership. (Tr. at 86, 140–41). Danny O'Brien testified that he and Boquist were each 50 percent owners in ICI. (Tr. at 116). The Court has adopted Boquist's numbers and not O'Brien's only because Boquist's recollection that he owned less of ICI than recalled by others is still sufficient to show that he owned a substantial portion of the company.

2. At all times relevant to this case, Alaska Native Corporations were exempt from the dollar limitations on contracts that can be received outside of the competitive bidding process that were applicable to other 8(a) businesses. 13 C.F.R. § 124.506(b) (2006).

3. Pub.L. No. 85–536, 72 Stat. 384 (1958) (codified as amended at 15 U.S.C. §§ 631–657(f) (2000)).

Tatitlek was an Alaska Native Corporation that was providing training services for the U.S. Marine Corps in California. (Tr. at 7, 9, 143). Tatitlek passed on contracting with ICI, however, because ICI only had prior experience in aviation services, not training services. But, Tatitlek did hire two ICI employees with military experience to provide short term consulting services. (Tr. at 9, 145–47). Stephens and Boquist kept in contact after this initial meeting and continued to explore future contracting opportunities. (Tr. at 144).

In late 2006 or early 2007, Stephens left Tatitlek and joined DTS/Katmai. (Tr. at 10). Ouzinkie Native Corporation (Ouzinkie), an Alaska Native Corporation created for the village of Ouzinkie on Spruce Island, Alaska, is the majority owner of Katmai, a holding company for its for-profit corporations. (Tr. at 92–93). Katmai Government Service owns 51% of ILSC Holdings LC, and DTS is a division of ILSC that provides training support services to the U.S. military. (Tr. 10, 92–93).

At about the same time, DTS, with the assistance of ICI as its teaming partner,[4] was awarded its first contract with the military to provide realistic-training services for the Marine Corps troops at Camp Lejeune, North Carolina before they were deployed to Iraq and Afghanistan. (Tr. at 10–12). This contract was to be primarily performed at Camp Lejeune, but during the summer of 2007, DTS and ICI conducted training services for troops at the U.S. Army base at Fort Greeley, Alaska. (Tr. at 27–28). Boquist traveled to Alaska for the mission, and brought with him numerous blank-firing AK–47s (and/or

SKS rifles) and camping gear for the ICI employees taking part in the mission. (Tr. at 28, 155–56, 168–69); (Exhibits 3–5). He also brought a .45 caliber handgun as his personal sidearm. (Tr. at 28). When the mission was over, Boquist left his handgun with Stephens to be stored in Stephens' personal gun safe located at DTS's Anchorage office. (Tr. at 28–29). Whenever he returned to Alaska, Stephens would return the handgun to Boquist for him to carry while in Alaska. (Tr. at 29).

**B. The 8028 Contract and Subcontract**

In 2008, the Program Manager for Training Systems for the U.S. Marine Corps (PM TRAYSIS) awarded DTS Prime Contract Number M67854–08–D–8028, which all parties refer to as the "8028 Contract." Under the 8028 Contract, the U.S. Marine Corps again hired DTS to provide pre-deployment training missions at Camp Lejeune, but this time for a five-year period. (Tr. at 37). In conformity with their previous understandings, DTS awarded ICI a subcontract to provide on-the-ground support for DTS's obligations to the Marines. That subcontract forms the basis of the litigation: Subcontract DTS 08–D–0001 (the 8028 Subcontract or Subcontract). (Exhibit 21).

Subcontract 8028 is 24–pages long and calls for DTS to pay ICI over $29.5 Million for its part in performing the 8028 Contract. (Exhibit 21 at 3). The cover page of the Subcontract prominently states that the agreement is:

BETWEEN

---

4. Stephens testified that Boquist's involvement was "essential" in obtaining the initial contract: "He met with the Marine Corps with [DTS personnel] to help develop the scope of work, provided capabilities briefs. We went to Camp Lejeune and, you know, did an assessment of what resources were there. He was basically, you know, our partner through the entire stand-up process. Couldn't have done it without him." (Tr. at 12).

Defense Training Systems (DTS)
701 E. Tudor Road, Suite 215
Anchorage, Alaska 99503

AND

International Charter Inc. of Wyoming
2710 Thomes Avenue # 589
Cheyenne Wyoming 82001

FOR

Civilians on the Battlefield and Support
Contract
United States Marine Corps (USMC)
Marine Corps Base, Camp Lejeune, NC

(Exhibit 21 at 1). The header on every page recites DTS's Anchorage address. (Exhibit 21 at 1–24). Finally, the Subcontract provides that the "validity, construction, scope and performance of this Subcontract shall be governed by the laws of the State of Alaska." (Exhibit at 24). The Subcontract did not include a forum-selection clause.

Boquist made at least 10 trips to Alaska during the five-year performance of the 8028 Contract from May 2008 through April 2013. (Doc. 65 at 6); (Exhibit 20 at 2–3).[5] Of the 10 trips, three were directly undertaken for the 8028 Subcontract. The first trip took place on June 2–5, 2008, when Boquist and other ICI executives, Stephens and other DTS executives, and Marine Corps personnel attended an award conference in Anchorage to celebrate the 8028 Contract and to discuss its implementation. (Tr. at 170–71); (Exhibit 6). The second trip took place on July 28–31, 2010, when DTS and ICI executives met in Girdwood, Alaska for a retreat to iron out problems that had arisen between DTS and ICI. (Tr. at 180); (Exhibit 12). The third trip took place on January 27–28, 2011. (Tr. at 181); (Exhibit 19). At that meeting Boquist offered to sell the remainder of the Subcontract to DTS because of the continued breakdown in the relationship between ICI and DTS. (Tr. at 181).

The remaining seven trips were prompted by reasons other than the Subcontract. Boquist undertook six of those trips to deal with training missions at Alaska military bases that did not fall under the 8028 Contract, (Exhibits 9–11, 13, 15 and 16–17), and the other trip was a vacation when Boquist and his wife attended a wedding in Kenai, Alaska. (Tr. at 171–78); (Exhibit 8). During these trips, however, Boquist always took the opportunity to stop by DTS's Anchorage office to talk about the 8028 Subcontract. (Tr. at 182).[6]

Boquist was the ICI executive who dealt with DTS/Katmai at the management level. Boquist sent thousands more emails than any other ICI employee to DTS/Katmai executives.[7] (See Exhibits 1 and 2). Danny O'Brien, a former ICI executive and business partner with Boquist, testified that Boquist was "a hundred percent" the primary contact between DTS/Katmai executives and ICI. (Tr. at 121). Email correspondence between Stephens and Boquist shows that Boquist was willing to "jump a flight up to Anchorage" to discuss

---

5. Plaintiffs' provided a demonstrative exhibit during the evidentiary hearing on this matter. (Exhibit 20). That exhibit documents thirteen confirmed trips Boquist made to Alaska and one unconfirmed trip on or around April 8, 2009. (Exhibit 20 at 2).

6. Boquist's testimony established that the 8028 Subcontract was the biggest contract between DTS and ICI, and that it would therefore be natural for him to discuss it at

some point whenever he met with DTS executives in Alaska. (Tr. at 182).

7. DTS introduced a summary of all emails sent from Boquist's six email accounts. (Exhibit 1). That summary provides that Boquist sent 3,243 messages to DTS personnel email addresses from 2006 until the present. (Exhibit 1). Of those 3,243 messages, 1,469 were sent to Stephens. (Exhibit 1).

business with Stephens "at the executive level." (Plaintiffs' Exhibits 7 and 9). Boquist provided Stephens a secure telephone to install in his Anchorage home to protect any classified discussion about the 8028 Contract. (Tr. at 186–187).[8]

While the Subcontract called for ICI to provide services to DTS for five years from May 2008 through April 2013, by January 2011, the relationship between ICI and DTS had become rocky. (Tr. at 179). Boquist met with Stephens in Anchorage (the last of the three trips Boquist took that directly pertained to work on Subcontract 8028) and offered to sell DTS/Katmai "the remainder of the contract." (Tr. at 179).

## C.  The Current Litigation

On July 10, 2013, DTS and Katmai filed a complaint against Boquist and ICI in Alaska state court. (Doc. 1–1). It alleged that in September 2012, Boquist requested that the 8028 Subcontract be renegotiated "and the fixed prices of the subcontract be increased because of the reduction in the quantity of services it would be providing under the subcontract." (Doc. 1–1 at 7). When DTS declined to renegotiate, Boquist and ICI allegedly blackmailed DTS by threatening to tell the Program Manager for Training Systems (PM TRAYSIS) of the United States Marine Corps and the public that DTS had engaged in unethical and illegal conduct in connection with Contract 8028—specifically, that DTS had hired active duty Marines as support personnel for its role player training exercises—even though these allegations were groundless, according to Plaintiffs. (Doc. 1–1 at 7). DTS continued to refuse to renegotiate, and Boquist made good on his threat and disclosed the false allegations

both verbally and in writing to the Marine Corps, and in particular, to the PM TRAYSIS, according to the complaint. (Doc. 1–1 at 7).

After the Naval Criminal Investigation Service (NCIS) cleared DTS of any wrong doing, DTS terminated the 8028 Subcontract with ICI for material breach of the non-disparagement clause of the contract. (Doc. 1–1 at 8). Boquist then filed "multitudinous frivolous requests under the Freedom of Information Act" with the Marine Corps and PM TRAYSIS, for the purpose of making implied allegations of improper conduct and to "create ill-will toward DTS and Katmai," according to the complaint. (Doc. 1–1 at 8). Boquist also allegedly spread lies about DTS to all ICI employees, including those seeking employment with DTS, as well as various vendors and suppliers of DTS. (Doc. 1–1 at 8).

Based on his conduct, DTS/Katmai sued Boquist for: (1) intentional interference with the 8028 Contract, (2) intentional interference with prospective economic advantage, (3) defamation per se, (4) intentional misrepresentation, and (5) negligent misrepresentation. (Doc. 1–1 at 9–12). Boquist moves for dismissal of these claims, arguing that this Court lacks personal jurisdiction over him. (Doc. 12).

## III.  DISCUSSION

### A.  Specific Jurisdiction Case Law

Where, as here, there is no applicable federal statute governing personal jurisdiction, the district court applies the law of the state in which the district court sits. *See* Fed.R.Civ.P. 4(k)(1)(A); *Panavision Intl., L.P. v. Toeppen*, 141 F.3d 1316, 1320 (9th Cir.1998). Because Alaska's long-arm

---

**8.**  Boquist explains that the secured telephone was the Secure Telephone III, or STU–III, commonly used by military headquarters to

communicate classified work. (Doc. 66 at 16). The parties colloquially referred to this phone as the "bat phone."

jurisdictional statute is coextensive with federal due process requirements, the jurisdictional analysis under state law and federal due process are the same. *Polar Supply Co., Inc. v. Steelmaster Industries, Inc.,* 127 P.3d 52, 54–55 (Alaska 2006) (noting that Alaska's long-arm statute is "coextensive with the Fourteenth Amendment."); *Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme,* 433 F.3d 1199, 1205 (9th Cir.2006) (en banc).

The Due Process Clause of the Fourteenth Amendment "protects an individual's liberty interest in not being subject to the binding judgments of a forum with which he has established no meaningful 'contacts, ties, or relations.'" *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 471–72, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985) (quoting *Intl. Shoe Co. v. Washington,* 326 U.S. 310, 319, 66 S.Ct. 154, 90 L.Ed. 95 (1945)). Stated another way, a forum state may exercise personal jurisdiction over a non-resident defendant only if the defendant has "certain minimum contacts with it such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Intl. Shoe,* 326 U.S. at 316, 66 S.Ct. 154 (quoting *Milliken v. Meyer,* 311 U.S. 457, 463, 61 S.Ct. 339, 85 L.Ed. 278 (1940)).

■ There are two types of personal jurisdiction: general and specific. *Panavision Intl.,* 141 F.3d at 1320. Generally, general jurisdiction empowers a forum court to adjudicate any claim against a non-resident defendant for conduct that occurred anywhere because the defendant's contacts with the forum state are so substantial, continuous and systematic that the defendant can be deemed "present" in that forum for all purposes. *Yahoo!,* 433 F.3d at 1205. Specific jurisdiction, on the other hand, permits a court to adjudicate only claims that arise out of the "relationship between the defendant's forum contacts and the plaintiff's claim." *Yahoo!,* 433 F.3d at 1205; *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 414 nn. 8–9, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984) (discussing differences between general and specific personal jurisdiction).

United States District Court Judge Sedwick has ruled that Boquist's contacts with Alaska are insufficient for the Court to exercise general personal jurisdiction over him. (Doc. 41 at 9–10). This Court is tasked only with determining whether the U.S. District Court in Alaska can exercise specific jurisdiction over Boquist for the purposes of Plaintiffs' claims. (Doc. 41 at 11).

■ "The inquiry whether a forum State may assert specific jurisdiction over a nonresident defendant 'focuses on "the relationship among the defendant, the forum, and the litigation."'" *Walden v. Fiore,* —— U.S. ——, ——, 134 S.Ct. 1115, 1121, 188 L.Ed.2d 12 (2014) (quoting *Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 775, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984) in turn quoting *Shaffer v. Heitner,* 433 U.S. 186, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977)).[9]

9. In *Walden v. Fiore,* the U.S. Supreme Court recently reaffirmed that whether a non-resident defendant has sufficient minimum contacts depends on *his* contacts with the *forum state.* 134 S.Ct. at 1122. The Ninth Circuit panel had erroneously "shifted the analytical focus" from the defendant's contacts with the forum to his contacts with the plaintiffs who he knew had contacts with the forum state. *Walden,* 134 S.Ct. at 1124. "This approach to the 'minimum contacts' analysis impermissibly allow[ed] [the] plaintiff's contacts with the defendant and forum to drive the jurisdictional analysis." *Walden,* 134 S.Ct. at 1125. *Walden's* holding does not affect this case, however, as Boquist's contacts with Alaska were substantial and purposeful.

While there are thousands of court opinions analyzing specific personal jurisdiction, *Burger King* deserves close attention because its facts closely track those in the instant case. There, the Supreme Court held that a Florida court had specific personal jurisdiction over a Michigan franchisee, John Rudzewicz, who was sued by Burger King for breach of the franchise contract and tort claims stemming from that contract after he failed to make monthly payments to Burger King headquarters in Miami and continued to run the restaurant after Burger King ordered him to cease operations. 471 U.S. 462, 464–69, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985). The Court did not articulate or apply different tests for personal jurisdiction between Burger King's tort claims and its contract claims. Instead, it concluded that the "constitutional touchstone remain[ed] whether the defendant purposefully established minimum contacts with the forum." *Burger King,* 471 U.S. at 469, 105 S.Ct. 2174. This inquiry required the Court to analyze "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing[.]" *Burger King,* 471 U.S. at 479, 105 S.Ct. 2174. The Court first noted that Rudzewicz had *no* physical ties to Florida, because it appeared from the record that he had "never even visited there." *Burger King,* 471 U.S. at 479, 105 S.Ct. 2174. Nonetheless, the franchise dispute "grew directly out of 'a contract which had a *substantial* connection with that State.' " *Burger King,* 471 U.S. at 479, 105 S.Ct. 2174 (quoting *McGee v. Intl. Life Ins. Co.,* 355 U.S. 220, 223, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957)). Analyzing Rudzewicz's interactions with the Florida-based company in light of its specific personal jurisdiction cases, the Court noted:

Eschewing the option of operating an independent local enterprise, Rudzewicz deliberately "reach[ed] out beyond" Michigan and negotiated with a Florida corporation for the purchase of a long-term franchise and the manifold benefits that would derive from affiliation with a nationwide organization. *Travelers Health Assn. v. Virginia,* 339 U.S. 643, 647, 70 S.Ct. 927, 94 L.Ed. 1154 (1950). Upon approval, he entered into a carefully structured 20–year relationship that envisioned continuing and wide-ranging contacts with Burger King in Florida. In light of Rudzewicz' voluntary acceptance of the long-term and exacting regulation of his business from Burger King's Miami headquarters, the "quality and nature" of his relationship to the company in Florida can in no sense be viewed as "random," "fortuitous," or "attenuated." *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958); *Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 774, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984); *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 299, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980).

*Burger King,* 471 U.S. at 479–80, 105 S.Ct. 2174 (brackets in original). In sum, Rudzewicz could not avail himself of the advantages of contracting with a Florida-based company with national prominence in the restaurant industry and then claim that due process principles prohibited Florida courts from adjudicating tort and contract claims that arose from that relationship. *Burger King,* 471 U.S. at 480, 105 S.Ct. 2174.

Moreover, the Court reasoned, the contract's choice-of-law provision that the contract "shall be governed and construed in accordance with the laws of the State of Florida[,]" showed that Rudzewicz had " 'purposefully availed himself of the benefits and protections of Florida's laws' by

entering into contracts expressly providing that those laws would govern franchise disputes." *Burger King*, 471 U.S. at 481–82, 105 S.Ct. 2174 (quoting Court of Appeals dissent). Finally, the Court noted that Rudzewicz had not made a showing of why it would be unreasonable to litigate the case in Florida because he had not shown that the inconvenience was "so substantial as to achieve *constitutional* magnitude." *Burger King*, 471 U.S. at 483–84, 105 S.Ct. 2174 (emphasis in original).

Given these ample contacts between Rudzewicz and Florida and his failure to show an unconstitutional inconvenience of litigating there, the Court held that "Rudzewicz established a substantial and continuing relationship with Burger King's Miami headquarters, received fair notice from the contract documents and the course of dealing that he might be subject to suit in Florida, and has failed to demonstrate how jurisdiction would otherwise be fundamentally unfair...." *Burger King*, 471 U.S. at 487, 105 S.Ct. 2174.

In accordance with the *Burger King* Court's analysis, the Ninth Circuit has held that a federal District Court has specific personal jurisdiction over a non-resident defendant, if his conduct fulfills the following three-part test:

(1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;

(2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and

(3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.

*Yahoo!*, 433 F.3d at 1205–1206. Also consistent with *Burger King*, the plaintiff has the burden of establishing the first two prongs. *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004). If the plaintiff succeeds in satisfying both of the first two prongs, "the burden then shifts to the defendant to 'present a compelling case' that the exercise of jurisdiction would not be reasonable." *Schwarzenegger*, 374 F.3d at 802 (quoting *Burger King*, 471 U.S. at 476–78, 105 S.Ct. 2174).

**B. Application of *Burger King*/*Yahoo!* Test to instant case.**

Here, the facts in favor of Alaska personal jurisdiction over Boquist for his allegedly disparaging statements about Plaintiffs to government contractors in Florida are even stronger than those that afforded Florida courts personal jurisdiction over Rudzewicz, in *Burger King*.

**1. Boquist's Purposeful Establishment of Minimum Contacts in Alaska**

■ The Court begins by noting that unlike Rudzewicz in *Burger King* who had "never visited" Florida, 471 U.S. at 479, 105 S.Ct. 2174, Boquist traveled to Alaska first, specifically to shop for a contract with an Alaskan Native Corporation, and secondly, in conjunction with Subcontract 8028. Boquist traveled to Alaska in late 2004 or early 2005 for the *specific purpose* of seeking an Alaska Native Corporation (ANC) that he could team with to take advantage of the ANC's preference in procuring government contracts.[10] It was

---

**10.** While Boquist admits he traveled to Alaska to seek an Alaskan Native contracting partner, he claims that this 2004/2005 conduct

cannot be used to establish his contacts with Alaska because it did not immediately ripen into the contract at issue in this case. The

during this trip that Boquist first met Stephens and the two planted the seeds of a contractual relationship that flowered into a multimillion dollar contract with the United States Marine Corps—Contract 8028—and thereby Subcontract 8028 that awarded $29.5 million to ICI. As noted *supra,* Boquist admits that he traveled to Alaska on at least three other occasions *specifically* in relation to Subcontract 8028:

1. June 2–8, 2008: Boquist and other ICI executives and Stephens and other DTS/Katmai executives and Marine Corps personnel all met in Anchorage for an "award conference" to celebrate the 8028 Contract and to discuss its implementation.

2. July 28–31, 2010: Boquist and other ICI executives and Stephens and other DTS/Katmai executives met in Girdwood, Alaska for a "retreat" to iron out problems that arose in the execution of Subcontract 8028.

3. January 27–28, 2011: Boquist flew to Anchorage, met with Stephens, and offered to sell the remainder of Subcontract to 8028 to DTS/Katmai.

(Doc. 64 at 17–18). The Court notes these physical entries, not to assert that Boquist's travels to Alaska alone would permit Alaska to exercise personal jurisdiction over him, but rather because *Burger King*

made the common-sense conclusion that a defendant's physical presence in the forum state enhance a defendant's affiliation with that state for "minimum contact" purposes. 471 U.S. at 476, 105 S.Ct. 2174. Boquist's several business trips to Alaska related to Subcontract 8028, including a trip undertaken specifically to find an Alaskan-based contracting partner, weigh in favor of establishing "minimum contacts" with Alaska.

Moving beyond Boquist's physical presence in Alaska, the Court notes that like Rudzewicz's contract with Florida-based Burger King, Boquist and ICI purposefully entered into a contract that had "*substantial* connection with [Alaska]." *Burger King,* 471 U.S. at 479, 105 S.Ct. 2174. Instead of submitting bids to the U.S. Military on their own, Boquist and ICI followed the U.S. State Department's advice and "reached out beyond" Oregon (Boquist's state of residence) and Wyoming (ICI Wyoming's headquarters) to negotiate with an Alaskan-based corporation to obtain the "manifold benefits," *Burger King,* 471 U.S. at 480, 105 S.Ct. 2174, of contracting with an Alaska Native Corporation (ANC). ANCs, of course, are legally entities that owe their existence to Alaska's unique history with its indigenous people and Congress's desire to settle aboriginal rights to land in Alaska.[11] At the

Court rejects this crabbed view of what forum-related contacts are relevant to the specific personal jurisdiction inquiry. The fact that Boquist traveled to Alaska and met with Stephens in an effort to contract with an Alaskan-based company informs the Court that Boquist was purposefully contracting with ANC-owned companies, such as DTS/Katmai. *See Burger King,* 471 U.S. at 478–79, 105 S.Ct. 2174 (emphasizing that courts are to apply a "highly realistic approach that recognizes that a contract is ordinarily but an intermediate step serving to tie up prior business negotiations with future consequences which themselves are the real

object of the business transaction.") (internal quotation marks and citations omitted).

11.　ANCs are legal entities created by Congressional passage of the Alaska Native Claims Settlement Act of 1971 (ANCSA). Pub.L. No. 92–203, 85 Stat. 688 (1971) (codified as amended at 43 U.S.C. §§ 1601–1629(h) (2000)). Congress passed ANCSA, in part, to settle aboriginal claims so that the "development and transportation of the state's oil resources could proceed in legal safety." Jenny J. Yang, *Small Business, Rising Giant: Policies and Costs of Section 8(a) Contracting Preferences for Alaska Native Corporations,* 23

time Boquist and ICI were seeking government contracts, ANCs enjoyed "powerful preference[s]" over other small businesses in government contracting. *See* Jenny J. Yang, *Small Business, Rising Giant: Policies and Costs of Section 8(a) Contracting Preferences for Alaska Native Corporations*, 23 Alaska L.Rev. 315, 319–328 (2006) (discussing The ANC "edge" in government contracting). Boquist succeeded. ICI entered into a multi-year, multi-million dollar contract ($29.5 Million) with DTS/Katmai, which "envisioned continuing and wide-reaching contracts" with DTS/Katmai in Alaska. *Burger King,* 471 U.S. at 480, 105 S.Ct. 2174.

Boquist was aware that DTS and Katmai were headquartered in Alaska. The front page of Subcontract 8028 lists DTS's address in two places as:

Defense Training Systems (DTS)
701 E. Tudor Road, Suite 215
Anchorage, Alaska 99503

(Plaintiffs' Exhibit 21 at 1). Every page thereafter contains a header with this same information. Boquist also provided Stephens with a secure phone to be used at Stephens' Anchorage residence to discuss sensitive information. And emails Stephens sent to Boquist contained a signature line that advised Boquist that Stephens was a Chief Executive Officer and listed the same Anchorage address as his physical address. And, Boquist sent emails showing that he was willing to travel to Anchorage to discuss issues with Stephens "at the executive level." (Plain-

tiffs' Exhibit 9). In light of Boquist's voluntary acceptance of the five-year subcontract directed out of DTS/Katmai's Anchorage headquarters, his travel to Anchorage to discuss the Subcontract, and the inclusion of the DTS address in the Subcontract, Boquist's testimony that he did not understand DTS was headquartered in Alaska is not credible. (Tr. at 208).

Boquist also testified that he unaware that he was dealing with ANC-owned companies. (Doc. 64 at 15–16). At the hearing, Boquist said that he did not know DTS was affiliated with an Alaska Native Corporation subsidiary when he entered into the 8028 Subcontract. (*See* Tr. at 157–58, 162–64). The Court rejects this testimony as incredible for several reasons. First, Boquist testified that when he traveled to meet with Stephens initially it was *because* Stephens' employer, Tatitlek Native Corporation, enjoyed an Alaska ANC 8(a) contracting advantage. (Tr. at 198). Second, Boquist's former business partner, Danny O'Brien, testified that Boquist was well aware of DTS/Katmai's Alaska Native Corporation (ANC) affiliation. O'Brien unequivocally testified that the "whole reason of coming to Alaska was to work with an Alaska Native corporation so that we [O'Brien and Boquist] could enjoy some of the advantages, the contracting advantages. That was the whole reason for coming to Alaska." (Tr. at 122). And Stephens testified that he specifically discussed the corporate structure of

---

Alaska L.Rev. 315, 316 (2006). ANCSA extinguished all aboriginal rights-to-land claims to land in Alaska by Alaska Natives, and in return, Alaska Natives received over 40 million acres of land. *Id.* at 317. Moreover,

Under the law, all resident Alaska Natives received one hundred shares of stock in one of the twelve regional corporations and also became shareholders in the village corporations that were organized for their respec-

tive villages. ANCSA also distributed $462.5 million of congressional appropriations funds and $500 million in oil royalties to the thirteen regional corporations, which were in turn required to distribute the funds to the village corporations and to their shareholders who had no ownership in any village corporation.

*Id.* at 317–18.

DTS/Katmai with Boquist, and told him that the profits went to Alaska native shareholders. (Tr. at 94). Boquist's testimony that he was unaware that DTS/Katmai were Alaskan companies owned by an ANC that enjoyed advantages in procuring government contracts is not credible. *See Burger King,* 471 U.S. at 480–81, 105 S.Ct. 2174 (rejecting Rudzewicz's argument that it was reasonable for him to believe that the Michigan Burger King office was "for all intents and purposes the embodiment of Burger King" because such a conclusion would require the Court to overlook substantial evidence that he understood the headquarters was in Florida).

Finally, the 8028 Subcontract provided: "The validity, construction, scope and performance of this Subcontract shall be governed by the laws of the State of Alaska." (Plaintiffs' Exhibit 21 at 24). This choice-of-law provision reinforces Boquist's "deliberate affiliation" with the state of Alaska. *Burger King,* 471 U.S. at 482, 105 S.Ct. 2174.

The record establishes that Boquist "purposefully established 'minimum contacts' in [Alaska]." *Burger King,* 471 U.S. at 474, 105 S.Ct. 2174 (quoting *Intl. Shoe,* 326 U.S. at 316, 66 S.Ct. 154). Therefore, Plaintiffs have established the first prong of the three-part test articulated by the Ninth Circuit in *Yahoo!,* 433 F.3d at 1205–1206.

Before moving to the second prong of the *Yahoo!* test, the Court pauses to address Boquist's legal arguments. First, the Court rejects Boquist's attempt to use ICI's corporate identity to shield him from the contacts he formed with Alaska in furtherance of the 8028 Subcontract. Boquist asserts that the Court cannot use the contacts he made with Alaska in conjunction with the Subcontract to find sufficient minimum contacts because he undertook those trips on behalf of ICI, not for himself. (Doc. 64 at n.1). In substance, this is what the courts call a "fiduciary shield doctrine" argument. (Doc. 64 at n.1). Generally,

> [t]he fiduciary shield doctrine is a judicially created principle that precludes the exercise of personal jurisdiction over corporate agents or employees who are acting in the forum state in their role as corporate agents or employees. The rationale of the doctrine is that it is unfair to force an individual to defend a suit brought against the party personally in the forum where the individual's only relevant contacts are acts performed not for personal benefit but for the benefit of the employer.

Sonja Larsen, *Validity, Construction, and Application of "Fiduciary Shield" Doctrine—Modern Cases,* 79 A.L.R. 5th 587, 587 (2000) (hereinafter "Larsen"). While this principle has been employed in some situations in a few jurisdictions, the modern trend is to reject the doctrine because analysis of the corporate structure and agency relationships has no place in the constitutional inquiry of personal jurisdiction. *See* Larsen, 79 A.L.R. 5th at 587. The Ninth Circuit has joined the latter group and has rejected the doctrine as a constitutional, personal jurisdiction inquiry. *See Davis v. Metro Productions, Inc.,* 885 F.2d 515, 522 (9th Cir.1989) ("in both *Calder* and *Keeton,* the Supreme Court applied the constitutional due process analysis to the contacts of the individuals concerned; it did not consider the existence of a state-created corporate form to create a due process limit on jurisdiction."). The only situation where the Ninth Circuit will apply the doctrine is when the district court is sitting in diversity and the forum state has adopted the doctrine. *Davis,* 885 F.2d at 521–22 (rejecting application of doctrine because Arizona's "long-arm statute extends to the limit of constitutional

due process, and because it is not equitably limited by the fiduciary shield doctrine"). As noted *supra*, Alaska's long-arm statute, like Arizona's in *Davis*, extends to the limits of constitutional due process, *Polar Supply Co., Inc.*, 127 P.3d at 54–55, and the Court's research has revealed no case where an Alaskan court has equitably limited that reach by application of the fiduciary shield doctrine. In sum, the equitable doctrine is of no help to Boquist.[12]

■ The Court also declines Boquist's invitation to apply the "purposeful direction" test to determine whether his allegedly tortious statements were sufficiently directed at Alaska to give rise to personal jurisdiction. First, the Ninth Circuit's purposeful availment and purposeful direction tests are used to establish the same thing: did the defendant purposefully establish minimum contacts with the forum state. *See Burger King*, 471 U.S. at 473–478, 105 S.Ct. 2174 (discussing both "purposeful direction" and "purposeful availment" and concluding that the "constitutional touchstone remains whether the defendant purposefully established 'minimum contacts' in the forum State."). Hence, if a plaintiff establishes that the defendant has sufficient contacts with the forum state under one test, it has fulfilled its burden under the first prong of the Ninth Circuit's test. Indeed, this is why the Ninth Circuit utilizes the disjunctive "or" in its recitation of the first prong. *See Yahoo!*, 433 F.3d at 1206 ("Despite its label, this prong includes both purposeful availment and purposeful direction. It may be satisfied by purposeful availment of the privilege of doing business in the forum; by purposeful direction of activities at the forum; *or* by some combination thereof.") (emphasis in original).

■ Second, the "purposeful direction" test is a particularly poor fit for analyzing Boquist's relationship with Alaska that arose because of his contracting with DTS/Katmai. The Ninth Circuit's purposeful direction test requires that the defendant allegedly have: (1) committed an intentional act, (2) expressly aimed at the form state, and (3) causing harm that the defendant knows is likely to be suffered in the forum state. *Schwarzenegger*, 374 F.3d at 803.

All of the "purposeful direction" cases cited by Boquist involve cases where the defendant had little to no relationship with the forum state *prior* to the allegedly tortious conduct. *See Schwarzenegger*, 374 F.3d at 799 ("Fred Martin is an automobile dealership incorporated under the laws of Ohio and located in Barberton, Ohio, a few miles southwest of Akron. There is no evidence in the record that Fred Martin has any operations or employees in California; has ever advertised in California, or has ever sold a car to anyone in California."); *Walden v. Fiore*, —— U.S. ——, ——, 134 S.Ct. 1115, 1124, 188 L.Ed.2d 12 (2014) ("Petitioner never traveled to, conducted activities within, contacted anyone in, or sent anything or anyone to Neva-

---

**12.** To be sure, the Court does not quarrel with Boquist's assertion that "jurisdiction over an employee does not automatically follow from jurisdiction over the corporation which employs him." (Doc. 64 at 8 n. 1 citing *Keeton v. Hustler*, 465 U.S. 770, 781 n. 13, 104 S.Ct. 1473, 79 L.Ed.2d 790). Here, the Court did not improperly bootstrap ICI's corporate conduct in Alaska to Boquist in order to find personal jurisdiction over him. Instead, it individually analyzed Boquist's contact with Alaska, and concluded that he purposefully created sufficient contacts with the state for it to exercise personal jurisdiction over him. *See Calder v. Jones*, 465 U.S. at 789, 104 S.Ct. 1482 (rejecting arguments from editor and reporter that California could not have personal jurisdiction over them because they wrote the allegedly tortious article in furtherance of their jobs at the National Enquirer).

da.");  *Calder v. Jones,*  465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984) (defendants only prior connection to California was that they had traveled there on occasion for business unrelated to libelous story).

It makes good sense in these cases to analyze whether the defendant directed tortious conduct at the forum state because if there was no prior forum-related conduct, the only relevant conduct must arise from that tortious conduct. Stated another way, if a defendant has "never traveled to, conducted activities within, contacted anyone in, or sent anything to anyone in [the forum state][,]" *Walden,* 134 S.Ct. at 1124, the only conduct that could possibly be jurisdictionally relevant is the defendant's tortious conduct at issue in the lawsuit. Here, however, Boquist signed the multi-million, multi-year Subcontract 8028. (Plaintiffs' Exhibit 21 at 24). Not surprisingly, in executing the Subcontract Boquist engaged in substantial contacts with the State of Alaska for several years *prior to* his alleged actions that gave rise to this lawsuit. Given that the first prong is aimed at resolving whether a defendant has "purposefully established 'minimum contacts' in the forum State...." *Burger King,* 471 U.S. at 474, 105 S.Ct. 2174 (quoting *Intl. Shoe*), and the factual record here that Boquist made substantial contacts with Alaska related to obtaining and executing Subcontract 8028, and all of Plaintiffs' tort claims against him pertain to that Subcontract,[13] it would make little sense to apply the "purposeful direction" test that focuses only on the defendant's allegedly tortious conduct and its effect on the forum state. *See Yahoo!,* 433 F.3d at 1206 (distinguishing between

the conduct that satisfies the "purposeful direction" and the "purposeful availment" tests); *see also* Sasha Meschkow, *Unifying Personal Jurisdiction in the Ninth Circuit,* 43 Ariz. St. L.J. 1345, 1352 (2011) (noting that "the conduct necessary to satisfy each standard is different, allowing certain conduct to satisfy one standard of jurisdiction but not the other.").

Moreover, Ninth Circuit caselaw recognizes that the appropriate test—purposeful availment or purposeful direction—is not dictated by the species of claim against the defendant. Indeed, the Ninth Circuit has always qualified its rule statements for the two tests by stating that they are *typically* applied to certain types of claims:

> In tort cases, we *typically* inquire whether a defendant purposefully directs his activities at the forum state, ... [whereas] in contract cases, we *typically* inquire whether a defendant purposefully avails itself of the privilege of conducting activities or consummates a transaction in the forum....

*Yahoo!,* 433 F.3d at 1206 (internal brackets, quotation marks, and citations omitted) (emphasis added); *Schwarzenegger,* 374 F.3d at 802 ("A purposeful availment analysis is *most often used* in suits sounding in contract. A purposeful direction analysis, on the other hand, is *most often used* in suits sounding in tort.") (internal citations omitted) (emphasis added); *accord Washington Shoe Co. v. A–Z Sporting Goods Inc.,* 704 F.3d 668, 672–73 (9th Cir.2012) (quoting *Schwarzenegger's* and *Yahoo!'s* qualified rule statements). The Court concludes that this case fits the exception left open in these cases—it is a case where the defendant created a substantial contractual relationship with the

---

**13.** Plaintiffs' claims against Boquist are: (1) intentional interference with the 8028 Contract, (2) intentional interference with prospective economic advantage, (3) defamation per se, (4) intentional misrepresentation, and (5) negligent misrepresentation. (Doc. 1–1 at 9–12).

forum *prior to* any allegedly tortious statements were made.[14]

In sum, the Court concludes that Boquist "purposefully established 'minimum contacts' " in Alaska, *Burger King*, 471 U.S. at 479, 105 S.Ct. 2174 (quoting *Intl. Shoe*), by purposefully availing himself of the privilege of doing business in Alaska. *See supra* at 12–16. Like Rudzewicz in *Burger King*, Boquist cannot travel to Alaska seeking the contracting advantage of Alaskan-based ANCs, avail himself of the powerful contracting advantages of teaming with an ANC-owned business, sign a $29.5 million contract that provides that Alaskan law governs the relationship, travel to Alaska in relation to that contract, and then claim that due process principles prohibit Alaskan courts from adjudicating tort and contract claims that arise from that relationship. *Burger King*, 471 U.S. at 480, 105 S.Ct. 2174. Plaintiffs have established the first prong of the Ninth Circuit's specific personal-jurisdiction test.

## 2. Plaintiffs' claims arise out of or relate to Boquist's forum-related activities.

■ The second prong of the Ninth Circuit's test requires Plaintiffs to show that its claims " 'arise out of or relate to the defendant's forum-related activities.' " *Yahoo!*, 433 F.3d at 1206 (quoting *Schwarzenegger*, 374 F.3d at 802). The Ninth Circuit applies a " 'but for' test to determine whether a particular claim arises out of forum-related activities and thereby satisfies the second requirement for specific

jurisdiction." *Ballard v. Savage*, 65 F.3d 1495, 1500 (9th Cir.1995); *Alexander v. Circus Circus Enterprises, Inc.*, 939 F.2d 847, 853 (9th Cir.1991), *rev'd on other grounds* 972 F.2d 261 (9th Cir.1992); *Menken v. Emm*, 503 F.3d 1050, 1059 (9th Cir.2007). A defendant's forum-related activities are a "but for" cause of a plaintiff's claim if "the entire course of events … was an uninterrupted whole which began with, and was uniquely made possible by, the [defendant's forum] contacts." *Alexander*, 939 F.2d at 853. The reviewing court is to assume the plaintiff's allegations as true in this analysis. *Menken*, 503 F.3d at 1059.

■ Here, Boquist's allegedly tortious conduct easily meets this standard because "but for" the 8028 Subcontract—a contract with substantial connections to Alaska—Plaintiffs' claims would not have arisen. Boquist needed an ANC partner to be competitive in obtaining the government contracts he desired, and Stephens needed someone with military experience to convince the military that DTS/Katmai could provide the necessary services.

Every aspect of the current lawsuit arises from Boquist's forum-related activities in Alaska—obtaining an ANC contracting partner and receiving the 8028 Subcontract based on that partnership, and working on the Subcontract in Alaska and elsewhere. *Alexander*, 939 F.2d at 853 ("the entire course of events … was an uninterrupted whole which began with, and was uniquely made possible by, the

---

14. Indeed, the Tenth Circuit has reasoned that in analyzing whether a forum state has personal jurisdiction over a contracting party for its allegedly tortious behavior directed at another contracting party, the reviewing court is to utilize *Burger King's* purposeful availment framework. *Far West Capital, Inc. v. Towne*, 46 F.3d 1071, 1079 (10th Cir.1995); *see also Real Estate Training Intl., LLC v. The*

*Nick Vertucci Companies, Inc.*, 2014 WL 1159675, **1–6 (W.D.Texas March 21, 2014) (Texas had personal jurisdiction over defendant for all tort and contract claims because defendant's forum contacts mirrored those in *Burger King* and "all the claims arise out of the same forum contact—the ongoing business relationship between the parties.").

[defendant's forum] contacts."). Boquist's forum-related activities are a "but for" cause of Plaintiffs' claims. Therefore, Plaintiffs' have shown that their claims against Boquist arise out of or relate to his forum-related activities. *Yahoo!*, 433 F.3d at 1206; *Schwarzenegger*, 374 F.3d at 802.

### 3. Alaska's exercise of jurisdiction over Boquist would not be unreasonable.

Because Plaintiffs have established the first two prongs of the Ninth Circuit's test, the burden "shifts to the defendant to 'present a compelling case' that the exercise of jurisdiction would be unreasonable." *Schwarzenegger*, 374 F.3d at 802 (quoting *Burger King*, 471 U.S. at 476–78, 105 S.Ct. 2174). In order to succeed on this prong, Boquist must show that the inconvenience of defending the lawsuit in Alaska is "so substantial to achieve *constitutional* magnitude[.]" *Burger King*, 471 U.S. at 484, 105 S.Ct. 2174 (citing *McGee v. Intl. Life Ins. Co.*, 355 U.S. 220, 223, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957)). This requirement reflects the reality that it is almost always inconvenient and costly for a foreign party to litigate in another state, but a defendant's due process rights are violated only when that exercise of jurisdiction is onerous in a special, unusual, or otherwise constitutionally significant way.

The Ninth Circuit has enumerated seven factors for the reviewing court to consider: (1) the extent of the defendants' purposeful interjection into the forum state's affairs; (2) the burden on the defendant of defending in the forum; (3) the extent of conflict with the sovereignty of the defendants' state; (4) the forum state's interest in adjudicating the dispute; (5) the most efficient judicial resolution of the controversy; (6) the importance of the forum to the plaintiff's interest in convenient and effective relief; and (7) the existence of an alternative forum.

*CE Distribution, LLC v. New Sensor Corp.*, 380 F.3d 1107, 1112 (9th Cir.2004).

Boquist has not shown, let alone made a "compelling case," that these factors weigh against Alaska's exercise of personal jurisdiction. Instead, he makes conclusory statements that "four of the seven factors—[ (1), (2), (5) and (7) ]—weigh against the exercise of jurisdiction over Boquist in Alaska and none in favor." [15] The Court disagrees.

Under factor (1), Boquist substantially interjected himself into the forum state's affairs by entering into and working on a $29.5 million, multi-year contract with an Anchorage-based ANC entity. This factor weighs in favor of jurisdiction.

Factor (2) is neutral. Boquist has made no showing that defending the claims against him would be especially burdensome. Instead, he merely says that it would be. The typical inconvenience of litigating in a foreign state is not what the second factor is designed to cover. Boquist has not shown why litigating the case in Alaskan court would be so inconvenient to rise to *constitutional* levels.

Factor (3) weighs in favor of jurisdiction. Boquist has made no showing that Alaska's exercise of jurisdiction would infringe on any other state's sovereignty.

Factor (4) weighs in favor of jurisdiction. "The forum state has a substantial interest in adjudicating the dispute of one of its residents who alleges injury due to the [ ] conduct of another." *CE Distribution*, 380 F.3d at 1112. And as Plaintiffs

---

**15.** The Court changed Boquist's use of roman numerals to Arabic numerals for ease of reference to Ninth Circuit case law.

point out, Alaska has a particularly strong interest in resolving disputes involving ANC contracting, "a hot-button issue in Alaska that receives substantial media coverage and is an issue unique to Alaska." (Doc. 66 at 13). Moreover, Katmai and DTS report 100% of their profits to their owner, Ouzinkie Native Corporation, a company with a majority of its shareholders living in Alaska. (Tr. at 94).

Factor (5) weighs in favor of jurisdiction. Boquist appears to assert that Oregon, Wyoming, Florida, North Carolina, or Virginia would all provide more efficient locations for judicial resolution of the case because the documentation and witnesses are located in those states. (Doc. 64 at 35). This argument ignores the caption of this case. ICI is also a Defendant in this case and the claims against it are based on the same facts as the claims against Boquist. The witnesses and documentation Boquist speaks of will therefore be in Alaska, and it would be most efficient to litigate Boquist's claims at the same time that this evidence is present in Alaska for ICI's trial.

Factor (6) only slightly favors jurisdiction in Alaska. As *CE Distribution* noted, "[l]itigating in one's home forum [by plaintiff] is obviously more convenient. We have noted, however, that this factor is 'not of paramount importance.'" 380 F.3d at 1112 (quoting *Harris Rutsky & Co. Ins. Servs., Inc. v. Bell & Clements Ltd.*, 328 F.3d 1122, 1133 (9th Cir.2003)).

Factor (7) favors Boquist, and weighs against the exercise of personal jurisdiction in Alaska. Oregon is a possible alternative forum, "indeed one where personal jurisdiction over [Boquist] is virtually unassailable." *CE Distribution*, 380 F.3d at 1112.

In sum, factors (1), (3), (4), (5), and (6) weigh in favor of exercising personal jurisdiction over Boquist. Factor (2) is neutral, and factor (7) weighs in favor of Boquist, and against the exercise of personal jurisdiction. Because a majority of factors weigh in favor of personal jurisdiction, Boquist has failed to make a "compelling case" that exercising personal jurisdiction over him would be unreasonable. *See CE Distribution*, 380 F.3d at 1112–13 (holding that a mere plurality of factors demonstrates that the exercise of personal jurisdiction over the defendant is reasonable); *Harris Rutsky*, 328 F.3d at 1134 (finding the exercise of personal jurisdiction reasonable even though balancing the seven factors resulted in "a wash.").

## IV. CONCLUSION

For the foregoing reasons, the Court concludes that Boquist "purposefully established 'minimum contacts'" in the state of Alaska and as a result, Alaska's courts may exercise personal jurisdiction over him when litigating Plaintiffs' claims that arise from Boquist's Alaska-related conduct. *Burger King*, 471 U.S. at 474, 105 S.Ct. 2174 (quoting *Intl. Shoe*, 326 U.S. at 316, 66 S.Ct. 154). And, the Court concludes that Boquist has not established a compelling case that exercising jurisdiction over him for claims arising from the 8028 Subcontract would be unreasonable. *Burger King*, 471 U.S. at 477, 105 S.Ct. 2174. Alaska's Federal District Court has personal jurisdiction over Boquist for the instant lawsuit. The Court therefore recommends that Boquist's Motion to Dismiss Defendant Boquist for Lack of Personal Jurisdiction (Doc. 12), be DENIED.

DATED at Anchorage, Alaska, this 18th day of June, 2014.